KEVIN P. HISHTA, *Pro Hac Vice*
kevin.hishta@ogletreedeakins.com
A. CRAIG CLELAND, *Pro Hac Vice*
craig.cleland@ogletreedeakins.com
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
One Ninety One Peachtree Tower
191 Peachtree Street, N.E., Suite 4800
Atlanta, GA 30303
Telephone:    404.881.1300
Facsimile:    404.870.1732

CHRISTOPHER W. DECKER, CA Bar No. 229426
christopher.decker@ogletreedeakins.com
ALEXANDER M. CHEMERS, CA Bar No. 263726
alexander.chemers@ogletreedeakins.com
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
400 South Hope Street, Suite 1200
Los Angeles, CA  90071
Telephone:    213.239.9800
Facsimile:    213.239.9045

Attorneys for Defendants
FLOWERS FOODS, INC., FLOWERS BAKING CO. OF CALIFORNIA,
FLOWERS BAKING CO. OF MODESTO, FLOWERS BAKERIES BRANDS, INC.

Additional Counsel Listed on Next Page

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MARK SOARES and BRIAN BOTELHO, <br><br> Plaintiff, <br><br> v. <br><br> FLOWERS FOODS, INC., FLOWERS BAKING CO. OF CALIFORNIA, FLOWERS BAKING CO. OF MODESTO, FLOWERS BAKERIES BRANDS, INC., and DOES 1 through 10, inclusive, <br><br> Defendant. | Case No. 3:15-cv-04918-JSC <br><br> **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** <br><br> *[Filed concurrently with Summary of Evidence, Compendium of Evidence, and Request for Judicial Notice]* <br><br> Date:          April 27, 2017 <br> Time:          9:00 a.m. <br> Courtroom:  F, 15th Floor <br> Judge:        Hon. Jacqueline Scott Corley <br><br> Complaint Filed:  October 26, 2015 <br> Trial Date:        Not Set |

1   BRIAN D. BERRY, CA Bar No. 229893
    brian.berry@ogletreedeakins.com
2   JARED L. PALMER, CA Bar 287974
    jared.palmer@ogletreedeakins.com
3   OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
    Steuart Tower, Suite 1300
4   One Market Plaza
    San Francisco, CA  94105
5   Telephone:     415.442.4810
    Facsimile:      415.442.4870

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

## <u>TABLE OF CONTENTS</u>

**Page**

I.  SUMMARY OF ARGUMENT ................................................................. 1

II.  STATEMENT OF FACTS ................................................................... 3

    A.  The "Prospective Distributors" ................................................. 4

    B.  The Distributor Agreement Establishes Only a Basic Framework for the Parties' Relationship ................................................................. 5

    C.  Distributors Operate Their Territories Differently ......................... 5

        1.  Whether a Distributor "Personally" Services a Territory Varies from Distributor to Distributor ................................. 5

        2.  How a Distributor Operates His or Her Territory Varies Based on the Distributor's Independent Business Decisions ............. 6

        3.  Efforts to Increase Sales Vary from Distributor to Distributor ...................................................................... 8

        4.  Equipment and Clothing Varies By Distributor ................... 8

    D.  Interactions with Flowers Management Varies ............................. 8

    E.  Plaintiffs' Witnesses Confirm this Variability ............................. 9

III.  LEGAL STANDARD ....................................................................... 10

IV.  CLASS CERTIFICATION IS NOT APPROPRIATE FOR THIS CASE ............... 10

    A.  Plaintiffs Cannot Establish Commonality or Predominance ......................... 10

        1.  No Questions Yield Common Answers Here ..................................... 10

            (a)  Plaintiffs Must Necessarily Look Beyond the DA to Establish a Uniform Right of Control Over the Manner and Means ............................................... 11

            (b)  Distributor College Does Not Establish a Uniform Right of Control Over the Manner and Means ..................... 12

            (c)  Other Circumstances Are Irrelevant And Do Not Establish a Uniform Right of Control Over the Manner and Means ............................................... 12

            (d)  Alleged Monitoring Does Not Show a Uniform Right of Control Over the Manner and Means ................................. 13

            (e)  The Record Confirms the Need for Individualized Inquiries .................................................................. 15

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

(f)     *Borello's* Secondary Factors Likewise Require Individualized Inquiries ........................................................ 16

2.     Determining When a Given Distributor "Personally Serviced" a Territory Also Requires Individualized Inquiries .......... 18

3.     Plaintiffs' Labor Code Claims Present Individualized Inquiries that Cannot Be Answered on a Classwide Basis ............... 19

B.     Plaintiffs Cannot Establish Rule 23(b)(3) Superiority. ................................. 22

1.     A Class Action Is Unnecessary Because Individual Actions Are Available and, In Fact, Already Pending ................................... 22

2.     A Class Action Is Not Superior Because Class Members Would Have to Litigate Numerous and Substantial Individual Issues ...................................................................... 23

3.     A Class Action Is Not Superior Because No Trial Plan Exists. ....................................................................... 23

C.     Plaintiffs Are Not Adequate Representatives and Their Claims Are Not Typical ....................................................................... 24

V.     CONCLUSION ......................................................................... 25

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**Federal Cases**

4

*Alberghetti v. Corbin Corp.*,
   263 F.R.D. 571 (C.D. Cal. 2010)...............................................................................24

5

*Alexander v. FedEx Ground Package Sys., Inc.*,
6   765 F.3d 981 (9th Cir. 2014) ....................................................................................16

7

*Amchem Products, Inc. v. Windsor*,
   521 U.S. 591 (1997) ..................................................................................................24

8

*Briseno v. ConAgra Foods, Inc.*,
9   844 F.3d 1121 (9th Cir. 2017) ..................................................................................19

10

*Colapinto v. Esquire Dep. Servs., LLC*,
   2011 WL 913251 (C.D. Cal. Mar. 8, 2011) .............................................................19

11

*Comcast Corp. v. Behrend*,
12   133 S. Ct. 1426 (2013) ..............................................................................................10

13

*Freund v. Hi-Tech Satellite, Inc.*,
   185 F. App'x 782 (11th Cir. 2006).............................................................................13

14

*Harris v. Vector Mktg. Corp.*,
15   753 F. Supp. 2d 996 (N.D. Cal. 2010) ......................................................................20

16

*Narayan v. EGL, Inc.*,
   285 F.R.D. 473 (N.D. Cal. 2012) ...............................................................16, 17, 19

17

18

*Norris-Wilson v. Delta-T Group, Inc.*,
   270 F.R.D. 596 (S.D. Cal. 2010) ...............................................................................21

19

*Rehberg v. Flowers Baking Co. of Jamestown*,
   2015 WL 1346125 (W.D.N.C. Mar. 24, 2015) .........................................................16

20

*Ruiz v. Affinity Logistics Corp.*,
21   2009 WL 648973 (S.D. Cal. Jan. 29, 2009) .............................................................20

22

*Ruiz v. Affinity Logistics Corp.*,
   754 F.3d 1093 (9th Cir. 2014) ..................................................................................16

23

*Sherman v. Am. Eagle Ex., Inc.*,
24   2012 WL 748400 (E.D. Pa. Mar. 8, 2012) ...............................................................16

25

*Smith v. Bayer*,
   564 U.S. 299 (2011) ....................................................................................................2

26

*Spencer v. Beavex, Inc.*,
27   2006 WL 6500597 (S.D. Cal. Dec. 15, 2006) ...............................................17, 19, 23

28

*Villalpando v. Exel Direct, Inc.*,
   303 F.R.D. 588 (N.D. Cal. 2014) ..............................................................................16

*Wal-Mart Stores, Inc. v. Dukes*,
   131 S. Ct. 2541 (2011) .......................................................................................10, 23, 24

*In re Wells Fargo Home Mortg. Overtime Pay Litig.*,
   571 F.3d 953 (9th Cir. 2009) ...........................................................................................10

*Zinser v. Accufix Research Inst., Inc.*,
   253 F.3d 1180 (9th Cir. 2001) .........................................................................................23

**California Cases**

*Ayala v. Antelope Valley Newspapers, Inc.*,
   59 Cal. 4th 522 (2014) ................................................................................................11, 15

*Cislaw v. So. Corp.*,
   4 Cal. App. 4th 1284 (1992) ...........................................................................................13

*Dailey v. Sears, Roebuck & Co.*,
   214 Cal. App. 4th 974 (2013) .........................................................................................21

*Gattuso v. Harte-Hanks Shoppers, Inc.*,
   42 Cal. 4th 554 (2007) ....................................................................................................20

*Patterson v. Domino's Pizza, LLC*,
   60 Cal. 4th 474 (2014) ....................................................................................................14

*S.G. Borello & Sons, Inc. v. DIR*,
   48 Cal. 3d 341 (1989) .....................................................................................................10

*Sotelo v. Media News Grp., Inc.*,
   207 Cal. App. 4th 639 (2012) .........................................................................................17

**California Statutes**

Cal. Lab. Code § 224 ...........................................................................................................21

**Other Authorities**

Fed. R. Civ. P. 23(a)(3)-(4) .................................................................................................24

Fed. R. Civ. P. 23(b)(3) .......................................................................................................10

Fed. R. Evid. 401 ...................................................................................................................9

Fed. R. Evid. 402 ...................................................................................................................9

Fed. R. Evid. 602 ...................................................................................................................9

Fed. R. Evid. 701 ...................................................................................................................9

McDonald's® "World-Class Training",
   *http://corporate.mcdonalds.com/mcd/franchising/*
   *us_franchising/why_mcdonalds/world_class_training.html*
   (last visited April 3, 2017)...............................................................................................12

Subway® Franchise FAQ, http://www.subway.com/en-
    us/ownafranchise/franchisingfaqs (click "6. Will there be training
    and support?") (last visited April 3, 2017) .................................................................12

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

I.      SUMMARY OF ARGUMENT

Plaintiffs raise a series of arguments that have already been rejected by the Central District of California.  In *Martinez v. Flowers Foods*, C.D. Cal. No. 2:15-cv-5112, Judge R. Gary Klausner denied an equivalent bid by Southern California Distributors to certify a class action against Defendant Flowers.[1]  The *Martinez* plaintiffs, who were represented by the same attorneys as the Plaintiffs in this action, brought identical claims against Flowers and relied on virtually the same arguments.  Denying the motion for class certification, Judge Klausner concluded that the *Martinez* plaintiffs had not satisfied the Rule 23 requirements, finding that "individual issues predominate as to the question of whether Defendants improperly classified class members as independent contractors instead of employees" and further that the proposed class definition was unworkable because the plaintiffs "failed to proffer a reliable method of ascertaining which individual class members personally serviced their routes as opposed to using helpers at any given time."[2]

Like the *Martinez* plaintiffs, Plaintiffs cannot establish predominance.  As a threshold matter, the Distributor Agreement ("DA") through which Plaintiffs operate specifies that Distributors are independent contractors and shall not be controlled by Flowers as to the specific details or manner of how they perform their work.  While Plaintiffs argue another provision in the DA ("Good Industry Practice") establishes the requisite uniform control, Judge Klausner persuasively reasoned that "the flaw in such an argument . . . is that 'Good Industry Practice' is an immensely broad standard that does not actually mandate any specific behavior.  Instead, the 'Good Industry Practice Standard' merely sets forth a general framework within which variations abound depending on the practical reality in a given situation."  *Martinez* Order at 11.  Plaintiffs' arguments that other provisions of the DA establish a uniform right to control—including Flowers' supposed ability to monitor Distributors, set their schedules, or control the details of their operations—were likewise rejected by Judge Klausner.  *Id*. at 12.

Because the DA does not establish a uniform right to control, and the Court is obligated to examine the course of conduct between the parties, "the variations among drivers do not merely

---

[1] Defendants are referred to collectively as "Flowers."  All testimony and exhibits referenced herein are attached to the concurrently filed Compendium of Evidence ("CE").
[2] Request for Judicial Notice ("RJN"), Ex. A, at 8, 14 (Feb. 1, 2016 Order Re: Plaintiffs' Motion for Class Certification) ("*Martinez* Order").

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

evince a difference in Defendants' *exercise* of control; rather, the variations among drivers manifest a difference in the actual scope of Defendants' *right* to control." *Id.* at 11 (emphasis in original). Thus, the scope of Flowers' alleged right to control Distributors is not susceptible to common proof, with Judge Klausner finding that other indicia also do not provide common proof of misclassification, including the "lack of a uniform policy [in the DA] governing the use of helpers." *Id.* at 13-14. Compounding the need for individualized inquiries is Plaintiffs' attempt to certify a class consisting of all Distributors who "personally serviced a territory," a definition that Judge Klausner rejected in *Martinez* because the Court would be "left to rely on piecemeal anecdotal evidence and individual drivers' memories dating back three years" as to when "individual class members personally service their routes as opposed to using helpers at any given time" (*id.* at 8), even though this information is required to resolve *any* of Plaintiffs' claims.

Ultimately, the only obvious difference between the two motions for class certification is that Plaintiffs here seek to represent Distributors in Northern California whereas the *Martinez* plaintiffs sought to represent Distributors in Southern California.[3] But this is a distinction that makes no difference. *See, e.g.*, *Smith v. Bayer*, 564 U.S. 299, 317 (2011) ("[W]e would expect federal courts to apply principles of comity to each other's class certification decisions when addressing a common dispute.").[4] Even if this Court were to disagree with the Central District and find that individual issues did not predominate as to the threshold issue of employment status, certification would still be unwarranted due to the overwhelming number of individualized inquires presented by Plaintiffs' Labor Code claims. Class treatment is also not superior, given the high value of Plaintiffs' claims and the number of separate lawsuits that are *already* pending. Finally, Plaintiffs are neither typical

---

[3] In fact, the *Martinez* plaintiffs initially sought to represent Distributors throughout the State of California, though they subsequently amended their Complaint to limit the class to Southern California only. CE8, Chemers Decl. ¶¶ 3-4; CE9-10. Even with this amendment, there is overlap between the two cases, since the *Soares* plaintiffs contend that the Northern California Distributors were uniformly misclassified by Flowers Baking Co. of California from February 2013 to February 2014, even though Judge Klausner previously found that certification was inappropriate for the Southern California Distributors who contracted with this *same* entity under the *same* DA during this *same* time period.

[4] An appeal in *Martinez* is currently pending before the Ninth Circuit. Although the *Martinez* lawsuit was voluntarily dismissed by the original plaintiffs, two proposed intervenors—who are also represented by the same plaintiffs' attorneys (Leonard Carder, LLP and Rukin Hyland, LLP)— subsequently sought to intervene for the purpose of challenging the *Martinez* class certification ruling. Because the motion to intervene was denied by the Central District, the proposed intervenors must first prove that they have standing to intervene before they can even challenge Judge Klausner's well-reasoned class certification decision on appeal. CE8, Chemers Decl. ¶¶ 6-7; CE12.

1    nor adequate representatives since the relief Plaintiffs seek—all of which is premised on their highly

2    individualized experiences and desire to be employees—is opposed by other putative class

3    members.  These Distributors prefer to be independent contractors because it gives them freedom,

4    the ability to profit from the work of others, and an opportunity to build equity—*circumstances that*

5    *are unheard of in a traditional employment relationship*.  Plaintiffs' Motion should be denied.

6    ## II.    STATEMENT OF FACTS

7            Plaintiffs are independent contractor franchisees with Flowers Baking Co. of California and,

8    subsequently, Flowers Baking Co. of Modesto.  Plaintiffs purchased distribution rights to market

9    and sell bakery products in a defined geographic territory.  This franchise model is common in the

10   industry and premised on the business reality that individuals and businesses who own distribution

11   rights have more financial incentive to develop business and generate additional sales based on their

12   own entrepreneurial efforts and individualized sales strategies.  (CE5, Wilson Decl. ¶ 2.)

13           Because Distributors own distribution rights, they have a tangible property interest that can

14   increase in value and can be sold, for a profit.  (CE5, Wilson Decl. ¶ 4.)  For example, Plaintiffs'

15   declarant Thurmond Mawyer pocketed $54,000 when he sold his territory.  (CE28, Mawyer Tr.

16   211:2-5.)  The valuation of these assets varies significantly, with one Distributor reporting that he

17   has over $200,000 in equity.  (CE3, Fernandes Decl. ¶ 41.)  Distributors take full advantage of the

18   entrepreneurial opportunities associated with this model.  Summary of Evidence ("SE") 17-21.[5]

19           Plaintiffs purchase products at a discount and then resell those products to various different

20   customers, including chain grocery stores, independent grocery stores, restaurants, and cash

21   customers.  Plaintiffs' compensation varies depending on their sales, with Botelho able to make

22   from $700 to $2,600 a week after expenses.  (CE27, Botelho Tr. 155:22-156:2.)  As Soares

23   acknowledges, "[e]very territory is different," with each Distributor having a varying mix of

24   customers that changes over time.  (CE26, Soares Tr. 113:22-114:14.); SE16.  Some Distributors

25   have mostly chain accounts, while others have more cash accounts, where they accept cash directly

26   for products sold and may have more discretion over price, product selection, promotions, and

27

28   ---
     [5] For example, some Distributors have their own business cards (CE21, Garibay Tr. 146:12-16;
     147:4-16), use stickers to increase sales (CE3, Fernandes Decl. ¶ 25), recommend and promote new
     products (CE22, N. Hernandez Tr. 102:3-5), and offer product samples (CE28, Mawyer Tr. 82:2-
     83:18).

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

displays and can extend them credit.  (CE5, Wilson Decl. ¶ 11.)[6]  Distributors are responsible for building relationships at the store level and taking various steps to increase their sales, although this varies by Distributor and account.[7]

### A.   The "Prospective Distributors"

In early 2013, Flowers Foods, Inc. acquired the rights to additional brands, including Sara Lee.  A new entity – Flowers Baking Co. of California – was created to manufacture and market the expanded list of products in California.  Because this entity was new to the California market, a group of "Prospective Distributors" ("PDs") were hired by a third-party staffing agency in 2013.  The purpose of the program was to expose the PDs to Flowers' business model and to give them 2-3 months working a territory so they could evaluate whether to purchase a distributorship.  (CE5, Wilson Decl. ¶ 6.)  This initial group of PDs attended a "Distributor College" in 2013, which introduced the PDs to the bakery industry generally and specifically to the bakery's systems, like the use of a handheld computer device for product ordering, inventory management, and other administrative functions.  (Id.)  However, other Distributors did not attend the Distributor College, including Distributors who bought territories after the initial roll-out and Distributors who bought territories directly from other Distributors.  (Id.)  And, even some who did attend the training admit that it did not tell them how to run their territory.  SE6[8]; (CE23, Tavarez Tr. 85:6-86:11.)  In fact, Botelho complained at his deposition that the Distributor College did not train him for the most important part of being a Distributor, namely, how to run his business.  (CE27, Botelho Tr. 98:24-100:11.)[9]

---

[6] See CE4, Silveira Decl. ¶ 23 ("I feel like I have more opportunities with my cash accounts because whatever they need, I supply it to them."); ¶ 24 (has extended credit to his caterer account – "With an account as big as my caterer, you end up having a personal relationship with the owner."); ¶ 26 ("I recommended more school products like hoagie rolls to the school and I introduced the Company's new school bagels that we started to bake too.").

[7] See, e.g., CE1, Barr Decl. ¶ 20 ("To increase my sales I have good relationships with my stores and I make sure I know my pricing."); CE19, M. Hernandez Tr. 119:8-22; CE21, Garibay Tr. 103:13-104:6; see also CE5, Wilson Tr. 53:21-25, 55:9-57:2.

[8] See, e.g., CE22, N. Hernandez Tr. 61:22-23 (did not attend Distributor College.); CE29, Marchand Tr. 59:7-15 (attended Distributor College but did not learn anything new; "[r]eally, the only difference were their dates on produce and their color ties; other than that, it's pretty similar").

[9] PDs were hourly and treated differently than Distributors.  (CE5, Wilson Tr. 187:6-20; CE31, Sotomayor Tr. 66:11-68:9 (PDs had a set start-time whereas Distributors "came in whenever they wanted"); 87:11-88:20 ("Q: And so after these ten guys in San Carlos purchased their territories . . . , did you offer them any training?  A: No. [O]nce they bought their own territories and stuff, I was just more there for – to be their partner."); CE26, Soares Tr. 94:24-25.)

**B.    The Distributor Agreement Establishes Only a Basic Framework for the Parties' Relationship**

Plaintiffs and others, many through their own independent corporations, entered into a DA. The DA establishes that the "DISTRIBUTOR is an independent contractor" and that "DISTRIBUTOR shall not be controlled by COMPANY as to the specific details or manner of DISTRIBUTOR's business. . . ."  (CE5 ¶ 7; CE6 at p. 1, "Witnesseth", ¶ 4; ¶ 16.1.)  Distributors' own testimony confirms that the DA does not allow Flowers to control their businesses.  SE29.[10]

Consistent with an independent contractor relationship, the DA establishes that Distributors are not required to personally perform the services, can hire helpers, can advertise, own outside businesses or perform work elsewhere, and buy and sell distribution rights.  (CE5 ¶ 7; CE6 ¶¶ 13.1, 15.1, 16.2, 19.2.)  Distributors are not required to wear a uniform, nor are they required to put logos on their vehicles.  (*Id.* ¶¶ 5.1, 19.2.)  Distributors are also permitted to sell both Flowers' products and non-competing products manufactured by other companies.  (*Id.* ¶ 5.1.)

Importantly, the DA is silent regarding the "specific details or manner" of the Distributors' businesses and, as discussed below, the evidence here confirms that Distributors can and do operate their distributorships in materially different ways.  The DA does, however, contain the general expectation that Distributors will follow "Good Industry Practice."[11]  As Plaintiffs concede, the DA "casts these obligations in broad terms," with Botelho testifying that his interpretation of Good Industry Practice was "totally different" than how it would be interpreted by another Distributor or by Flowers.  Mot. 7; (CE27, Botelho Tr. 174:18-175:13.)  Determining whether someone followed Good Industry Practice requires consideration of several factors outside of the DA, including the Distributor involved, customer, and underlying circumstances.  (CE7, Rich Decl., ¶¶ 6-8.)

**C.    Distributors Operate Their Territories Differently**

**1.    Whether a Distributor "Personally" Services a Territory Varies from Distributor to Distributor**

Whether a Distributor "personally" services one or more of his or her territories can and does

---

[10] *See, e.g.,* CE27, Botelho Tr. 167:5-168:15; CE26, Soares Tr. 124:25-125:19.  If anything, Botelho confirmed his understanding that the alleged conduct *violated* the DA.  *Id.* ("Q: [I]s it your belief that Flowers has violated this language in your contract?  A: Yes."); *see also* CE28, Mawyer Tr. 188:19-21 ("Q:  And as we sit here today, do you think that [the BSM], by his actions, violated the agreement?  A: Yes.").
[11] Good Industry Practice is defined as "the standards that have developed and are generally accepted and followed in the baking industry," and includes several broad, non-exhaustive examples.  (CE5 ¶ 7; CE6, ¶ 2.6.)

1  vary.  Some Distributors own multiple territories and others own a single territory.  SE1.[12]  Whether

2  they own one territory or several, many Distributors hire helpers to assist them in different ways and

3  in different frequencies, which varies by Distributor and over time.  Some hire helpers to operate the

4  territories on a full-time basis.  SE4.[13]  This includes "absentee" Distributors who hire helpers to

5  fully service their territories.  (CE5, Wilson Decl. ¶ 8.)  For instance, Plaintiffs' declarant William

6  Powell made the decision to hire an employee to single-handedly service his territory while Powell

7  himself attended exclusively to a concrete business that he founded as a wholly-owned subsidiary of

8  the corporation through which he operated his Flowers franchise.  (CE30, Powell Tr. 114:19-116:10;

9  118:15-119:3; 121:3-21.)  Other Distributors hire helpers to ride along with them each day, to help a

10  few days a week, or with a single customer or task.  SE7.[14]  Whether or when a Distributor uses

11  helpers or agents also changes over time.  SE8.[15]  One Distributor reports that, in addition to using

12  helpers, she "exchange[s] work" with a distributor for one of Flowers' competitors, including

13  stocking competing products.  (CE2, Cardoza Decl. ¶ 13.)

14      Because Distributors are not required to obtain Flowers' permission to use helpers, Flowers

15  has no way of knowing who is servicing a territory on a particular day.  (SE9; *see, e.g.,* CE5, Wilson

16  Decl. ¶¶ 8-9; CE31, Sotomayor Tr. 147:8-148:13; 187:18-188:6.)

17      **2.    How a Distributor Operates His or Her Territory Varies Based on the Distributor's Independent Business Decisions**

18      Distributors' operations vary in many other ways that show they independently control the

19  manner and means of their work.  For instance, Distributors admit they set their own work

20

---

21  [12] *See, e.g.*, CE3, Fernandes Decl. ¶ 4 ("Things were going well with my first territory so in June 2016 I purchased a second territory with a partner, Jim Towers. . . . By mid-summer we will probably have another."); CE18, Herrera Tr. 189:19-191:22 (purchased a second territory); CE4,

22  Silveira Decl. ¶ 11 (bought a second territory); ¶¶ 14, 52 (previously sold portion of a territory and is in the process of splitting the territory again and selling off part of it).  Some Distributors have sold

23  portions of their territories.  SE2.  Other Distributors have split their territories or considered doing so.  SE3.

24  [13] *See, e.g.*, CE30, Powell Tr. 64:10-15, 114:19-116:10; CE21, Garibay Tr. 144:9-146:4; 255:18-255:25; CE18, Herrera Tr. 91:6-25, 95:24-96:8, 96:21-97:11, 100:7- 102:1-11, 284:18-284:22,

25  287:17-21.

     [14] *See, e.g.*, CE3, Fernandes Decl. ¶ 10 (helper "would bounce between" his territory and the

26  territory of his business partner); CE18, Herrera Tr. 284:18-284:22, 287:17-21 (has a second agent who services his second territory); CE30, Powell Tr. 64:10-15, 114:19-116:10 (employee worked

27  his territory on a full-time basis for three months).

     [15] *See, e.g.*, CE26, Soares Tr. 166:1-168:21 (during the course of owning his distributorship he paid

28  five different people to assist him); CE21, Garibay Tr. 92:18-93:5; 139:7-16; 172:9-21; 176:14-178:1 (hired two helpers at different times and for different lengths of time); CE23, Tavarez Tr. 158:18-25, 165:25-166:22 (previously used three different helpers, not currently looking for a helper).

schedules, including when they begin and end work each day (CE2, Cardoza Decl. ¶ 40), whether

and when they take breaks (CE4, Silveira Decl. ¶ 34), and the order in which they visit accounts in

their territories.  (CE3, Fernandes Decl. ¶ 30).  While Plaintiffs claim that customer service

"windows" require them to start working at specific times, other Distributors report that they set

their own schedules.  SE10.[16]  Furthermore, "the customers dictate their door times"—not

Flowers—and they apply to *all* vendors at those stores.  (CE3, Fernandes Decl. ¶ 8; CE31,

Sotomayor Tr. 108:13-112:16.)[17]  Not only do these requirements vary from customer to customer,[18]

whether a Distributor abides by the customers' formal service requirements varies.  SE12.  For

example, one Distributor made informal arrangements with managers at his Safeway accounts to

routinely service their stores after the official service windows had closed.  (CE30, Powell Tr.

105:21-107:7; *see also* CE31, Sotomayor Tr. 136:8-19 ("[I]f you got along well with the manager or

receiving clerk, you could get away with three or four days.  So, basically, it was up to the store.").)

      Some Distributors admit they determine what products to order for their customers without

input from sales management, while others say sales management makes changes to their orders or

recommends that they order certain products.  SE13.[19]  Even then, however, some admit they follow

these recommendations, while others don't.  *Id.*[20]  One Distributor changes the suggested ordering

amount "daily based on need," even making changes on the day he picks up the order.  (CE3,

Fernandes Decl. ¶ 32.)  Other Distributors offer differing testimony regarding how they deliver and

---

[16] *See, e.g.*, CE3, Fernandes Decl. ¶ 28 ("It is up to me to set my own schedule each day.  I have flexibility because I have employees."); CE20, Brownfield Tr. 220:4-24 (he sets his own daily route and schedule, which has changed and adapted over time.); CE31, Sotomayor Tr. 67:3-8 ("Once they became independent operators, they all got a key to the depot and they came in whenever they wanted.")

[17] As one Distributor observes, this "is like any other business.  If you are going to mow lawns and someone wants you there at 1 p.m. you get there at 1 p.m. . . . Anything else – ordering, what I wear, that's completely up to me."  (CE3, Fernandes Decl. ¶ 8.)

[18] For example, although some customers require a visit each day, others do not.  SE11; (CE7, Rich Decl. ¶ 7)

[19] *Compare* CE2, Cardoza Decl. ¶ 45 ("I determine what product to order for customers."); ¶ 47 ("The Company does not add product to my order unless I ask them to."); CE4, Silveira Decl. ¶ 43 ("The Company never adds product to my order.  They may ask me if I want additional product, but I can say no."); CE1, Barr Decl. ¶ 12; *with* CE19, M. Hernandez Tr. 253:8-18 ("I believe that I can't turn [the BSM] down because it could lead to repercussion.")

[20] *Compare* CE1, Barr Decl. ¶ 28 ("I do my own ordering and do not follow the suggested orders at all."), CE4, Silveira Decl. ¶ 21 ("When I have been given a suggestion or recommendation, I don't always do it."); CE3, Fernandes Decl. ¶ 16 ("These recommendations are optional. . . . Normally I do what I want to do."); *with* CE26, Soares Tr. 55:22-24 (claiming Flowers required him to adopt suggested orders); *see also* CE31, Sotomayor Tr. 118:18-119:1 ("Q: And when you would tell them . . .were they required to cut back their product order?  A: No.  They pretty much decided what they wanted to do.").

1  rotate products at each customer location (SE14), change the product placement (SE20), and attempt

2  to minimize stale product (SE15).

### 3. Efforts to Increase Sales Vary from Distributor to Distributor

4  The extent to which Distributors take advantage of entrepreneurial opportunities to increase

5  sales also varies.  Some Distributors solicit new accounts.  SE17.[21]  Some Distributors rarely request

6  displays, while others ask for and get displays often.  SE18.[22]  Some Distributors extend credit to

7  their cash accounts.  (CE4, Silveira Decl. ¶ 24.)  Some Distributors market new products.  SE19.

8  For example, Michael Fernandes "pushed TastyKake products [in his Winco] and now it is the only

9  Winco in California that sells TastyKake products."  (CE3, Fernandes Decl. ¶ 22.)  Other business

10 owners use business cards, point of sale stickers, or give samples to increase their sales.  SE21.[23]

### 4. Equipment and Clothing Varies By Distributor

12 Distributors also use different types of vehicles.  Some use logos and advertise on them, and

13 some use multiple vehicles.  SE22.[24]  Their clothing also varies because Flowers does not require

14 them to wear a uniform or any other specific type of clothing: some Distributors wear plain clothing,

15 some Distributors wear clothing with the logos of the brands they sell, and other Distributors wear

16 custom clothing with the name of their corporations on it.  SE23.[25]

### D. Interactions with Flowers Management Varies

18 Branch Sales Managers ("BSMs") offer "[g]uidance and advice" to the Distributors "so that

19 they can be more profitable in their business."  (CE31, Sotomayor Tr. 108:3-12, 186:24-187:3.)  As

---

[21] *See, e.g.*, CE3, Fernandes Decl. ¶ 26 ("I worked hard to provide service to the Amazon fulfillment center in Tracy. . . . Now it is probably one of the busiest accounts we have."); CE2, Cardoza Decl. ¶ 54 ("I added the cash account, by just going in there and asking if they wanted my service."); *see also* CE31, Sotomayor Tr. 132:2-10 ("Q: Did you ever encourage distributors to try to seek out cash accounts in their territories?  A: No.  Q: Why not?  A: Cash accounts?  I left it up to them to decide how they wanted to run their business, if they wanted to pick up new accounts or if they didn't want to pick up new accounts.").

[22] *Compare* CE3, Fernandes Decl. ¶ 21 ("It is up to me to try to get additional space through displays and end caps.") *with* CE2, Cardoza Decl. ¶¶ 34-35 ("Food Source is the only store in which I try to get extra displays. . . Displays are hit and miss at other stores."); CE21, Garibay Tr. 224:22-225:25 (befriended a receiver at Safeway who helped him get a display "[a]nytime [he] asked," which he did several times a year); CE19, M. Hernandez Tr. 120:25-121:3, 121:14-16 (gets a nine-high display in Wal-Mart "[f]or the most part, consistently once a month.").

[23] *See, e.g.*, CE21, Garibay Tr. 146:12-16; 147:4-16; CE3, Fernandes Decl. ¶ 25; CE28, Mawyer Tr. 82:2- 83:18.

[24] *See, e.g.*, CE19, M. Hernandez Tr. 137:23-139:25; CE26, Soares Tr. 111:12-23, 172:14-173:4, 260:4-18, 262:12-19; CE1, Barr Decl. ¶ 31; CE4, Silveira Decl. ¶ 45.

[25] *See, e.g.*, CE22, N. Hernandez Tr. 145:22-146:11 (wears a shirt that says "Nick Owner/Operator" so "people know [his] name when [he's] in the store."); CE18, Herrera Tr. 310:10-311:24 (wears shirts with a logo for his business, "JH Distributorship," which he also provides to his helpers).

Case No. 3:15-cv-04918-JSC

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1    one Distributor observes, the BSM "is there to help me grow my business" but "I understand that

2    these suggestions and recommendations are optional."  (CE1, Barr Decl. ¶¶ 12-13.)  Some

3    Distributors claim that they receive a lot of suggestions from the BSM, which they may or may not

4    follow.  SE25.[26]  Distributors' level of interaction with BSMs also varies.  SE26.[27]  While Plaintiffs

5    and their declarants suggest that BSMs closely monitor the Distributors' performance with ride-

6    alongs and site visits, other Distributors report the exact opposite.  SE27.[28]

7    **E.    Plaintiffs' Witnesses Confirm this Variability**

8    Plaintiffs' own witnesses confirm the Distributors' varied experiences.  While Plaintiffs

9    submitted declarations from five non-party witnesses, the declarations are riddled with speculative,

10   conclusory, and irrelevant statements that are inadmissible under Rules 401, 402, 602, and 701 of

11   the Rules of Evidence.  On cross-examination, Plaintiffs' witnesses also admitted that their

12   statements were incomplete or inaccurate.  For example, despite claiming in his declaration that he

13   "monitored" Distributors and "ensure[d] . . . appropriate service," declarant and former BSM Al

14   Sotomayor testified very differently, including:

15   - "Everything that I did was as a partner with [the Distributors].  **I didn't try to tell them
       what to do, because that wasn't my job**.  This is what information I have.  Here's what
16     I'm giving you.  Now, if you choose not to do it, that's up to you.  I can't force you to do
       it.  Because it's your business."  (CE31, Sotomayor Tr. 55:9-15 (emphasis added).)

17   - The Distributors "pretty much did whatever they wanted.  It was their own business, to
       come in [to the warehouse] whenever they wanted."  (*Id.* at 59:13-15.)

18   - "We were instructed [by Flowers] to treat them as business partners."  (*Id.* at 102:10-11.)

19   - "**Most of what I did when I was there in San Jose was offer advice and suggestions,
       and that's all I ever did**.  So if the guys wanted to take it, great.  If not, you know, it's
20     not hurting me any.  You know, I just want to make sure that you understand that I'm
       here to help."  (*Id.* at 168:22-169:2 (emphasis added).)

21   - "I would let them know different situations, whether it's not enough or too much [bread

22

23   _____

     [26] *See, e.g.*, CE27, Botelho Tr. 196:16-198:4; CE21, Garibay Tr. 210:24-211:8; CE20, Brownfield
24   Tr. 136:33-137:4; CE23, Tavarez Tr. 124:13-125:17, 197:19-199:1; CE19, M. Hernandez Tr. 244:3-
     11, 245:3-246:10; CE29, Marchand Tr. 155:21-156:10.

     [27] *See, e.g.*, CE2, Cardoza Decl. ¶¶ 22-23 ("I try not to talk to my Branch Managers. Sometimes I
25   will go a whole week without speaking to them. Other times, I am in contact with them every day. . .
     . It is usually me reaching out to them, not them reaching out to me."); CE4, Silveira Decl. ¶ 18 ("I
26   see the Depot Manager three to four times a week[,] but if I don't have anything that needs to be
     done I only speak with him once or twice a week."); CE21, Garibay Tr. 215:14-215:21, 216:22-
27   217:8 (speaks with his BSM Manny Amaral "[m]aybe once a week, twice a week, depending on the
     week" and sees him "[m]aybe once every two months.").

     [28] *Compare* CE26, Soares Tr. 89:2-23, 174:9-20; 177:2-11; *with* CE3, Fernandes Decl. ¶ 15
28   ("Sometimes I will go a couple of weeks without talking to [the BSM].  If I don't need something, I
     don't talk to him."); *see also* CE31, Sotomayor Tr. 69:3-12 (never performed a ride-along with a
     Distributor and is not aware of any other BSM who performed one either).

1   to order], and make suggestions. . . . It would be up to them."  (*Id.* at 177:12-15.)

2   Plaintiffs' other witnesses also contradicted their previous statements.  *Compare* Marchand Decl.

3   ¶ 11 (claiming BSM "regularly visited and inspected my route") *with* CE29, Marchand Tr. 37:7-23

4   (testifying that "I never see [the BSM] on my route."); *see also* SE28.  These contradictory

5   statements illustrate the credibility determinations that would be required at trial, as well as the need

6   for individualized testimony from each Distributor and BSM regarding their experiences.

## III.   LEGAL STANDARD

8       Class actions are "an exception to the usual rule that litigation is conducted by and on behalf

9   of the individual named parties only."  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550-51

10   (2011).  A class action may be certified only after the Court "rigorously analyzes" whether Plaintiffs

11   have satisfied all four requirements of Rule 23(a) (numerosity, commonality, typicality, and

12   adequacy) and one of the requirements of 23(b)—here, 23(b)(3).  *Id.*

## IV.   CLASS CERTIFICATION IS NOT APPROPRIATE FOR THIS CASE

### A.   Plaintiffs Cannot Establish Commonality or Predominance

15       Plaintiffs' claims fail for multiple reasons, starting with their inability to meet Rule 23's

16   commonality and predominance requirements.  To satisfy Rule 23(a)(2), Plaintiffs must show that

17   there will be "common answers apt to drive the resolution of the litigation."[29]  In addition, to satisfy

18   Rule 23(b), Plaintiffs must establish that common "questions of law or fact" predominate—requiring

19   a "rigorous analysis" that is "even more demanding" than Rule 23(a).  F.R.C.P. 23(b)(3); *Comcast*

20   *Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013).  Just as the Southern California Distributors could

21   not meet these requirements in *Martinez*, so too the Northern California Distributors cannot meet

22   this standard here.  Class certification, therefore, is inappropriate.

### 1.   No Questions Yield Common Answers Here

24       Plaintiffs have not shown that common evidence will answer *Borello's* principal inquiry:

25   whether the defendant has "the right to control the manner and means of accomplishing the result

26   desired," with *Borello's* "secondary" factors presenting additional individualized questions that

27   preclude certification.  *S.G. Borello & Sons, Inc. v. DIR*, 48 Cal. 3d 341, 350 (1989).

28   ――――――――――――――

[29] Merely alleging that all Distributors were commonly misclassified fails is insufficient.  *See In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953 (9th Cir. 2009).

1

        **(a)**      **<u>Plaintiffs Must Necessarily Look Beyond the DA to Establish a</u>**
                                    **<u>Uniform Right of Control Over the Manner and Means</u>**

2
        The threshold question before the Court is not simply whether there is some right of control,

3
but whether the supposed control is ***uniform*** and extends to the ***manner and means*** by which

4
Distributors conduct their business.  The DA here expressly answers that question:  It prohibits

5
Flowers from controlling "the specific details or manner of DISTRIBUTOR's business. . . ."  (CE5

6
¶ 7; CE6 at p. 1, "Witnesseth", ¶ 4; ¶ 16.1)).  The plain language of the DA thus offers Plaintiffs no

7
support for their claim that Flowers has the right to control the Distributors' businesses.

8
        While the DA states that each Distributor should comply with "Good Industry Practice,"

9
Judge Klausner previously observed:

10
                "Good Industry Practice" is an immensely broad standard that does
                not actually mandate any specific behavior.  Instead, the "Good

11
                Industry Practice Standard" merely sets forth a general framework
                within which variations abound depending on the practical reality in

12
                a given situation.

13
*Martinez* Order at 11.  "Good Industry Practice" is, therefore, consistent with an independent

14
contractor relationship, which may specify the desired result but that "does not actually mandate any

15
specific behavior."  *Id*.

16
        To the extent that Plaintiffs persist in arguing that the "Good Industry Practice" provision

17
grants Flowers the right to control the manner and means of how they conduct their businesses, and

18
trumps the other language in the DA expressly disclaiming such control, Plaintiffs must necessarily

19
look beyond the four corners of the contract.  As the California Supreme Court explained in *Ayala v.*

20
*Antelope Valley Newspapers, Inc.*, where, as here, a party claims there is a "practical allocation of

21
rights at odds with the written terms" of a contract, the court will need to examine the parties' course

22
of conduct.  59 Cal. 4th 522, 535 (2014) (citing *Tieberg v. Unemployment Ins. App. Bd.*, 2 Cal. 3d

23
943, 952 (1970)).[30]  Like the district court in *Martinez*, therefore, this Court must assess how the

24
"Good Industry Practice" provision is interpreted and implemented *in practice*, including whether

25
there is a practical allocation of rights at odds with the language prohibiting Flowers' control.[31]

26
---
[30] Facing a similar situation, the trial court in *Kaewsawang v. Sara Lee Fresh, Inc.* reasoned:
"[w]hile there are also similar contracts, the issue of control in this action cannot be determined by

27
the Distribution Agreements . . . since many of the 'control' factors are not set forth in the contract."
RJN, Ex. B (p. 21; *see also* pp. 13-15).  The *Kaewsawang* court also rejected the plaintiffs'
contention that a similar contract provision ("best efforts") established uniform control.  *Id.* at pp.

28
11-15.
[31] As discussed above, assessing whether a Distributor complied with "Good Industry Practice"

1   Consequently, "the variations among drivers [with respect to the interpretation and implementation

2   of "Good Industry Practice"] do not merely evince a difference in Defendants' *exercise* of control;

3   rather, the variations among drivers manifest a difference in the actual scope of Defendants' *right* to

4   control."  *Martinez* Order at 11 (emphasis in original).

5   (b)   <u>Distributor College Does Not Establish a Uniform Right of<br>Control Over the Manner and Means</u>

6   Plaintiffs make a series of efforts to show that common evidence beyond the contract

7   establishes a uniform right of control, but each such effort fails.  To start, Plaintiffs' heavy reliance

8   on the Distributor College and the alleged training Flowers provided to Distributors is misplaced.

9   As an initial matter, the bulk of the Distributor College was spent emphasizing the independent

10  contractor business model that Flowers planned to implement and explaining how the bread business

11  works generally—information that was not news to the many Prospective Distributors who had

12  previous experience with other bread companies.  (CE5, Wilson Decl. ¶ 6.)  Thus, Plaintiffs'

13  assertion that Flowers used the Distributor College to articulate "its definition of 'Good Industry

14  Practice'" is baseless.  *See* Mot. at 7.

15  In addition, the fact that some PDs (just like the prospective owner of a Subway®,

16  McDonald's®, or other franchise)[32] together learned the basics of operating the handheld device and

17  running a Flowers franchise *prior* to purchasing and operating a territory does not establish Flowers'

18  right to control a Distributor *after* they enter into the DA.  *See Martinez* Order at 12 n.2 ("The DA

19  only mandates attendance for prospective distributors, not full-fledged drivers who have already

20  purchased their routes.").  Regardless, many Distributors did not even attend the Distributor College

21  and those that did admit the training did not tell them how to run their territory.  *See* Section II.A.

22  (c)   <u>Other Circumstances Are Irrelevant And Do Not Establish a<br>Uniform Right of Control Over the Manner and Means</u>

23  Plaintiffs' argument that Flowers is able to "control" the Distributors' business by retaining

24  the ability to set pricing, repurchase stale product, and add or delete products is misplaced.  Not only

25  necessarily requires consideration of varying factors outside of the DA.  (CE7, Rich Decl., ¶ 7).

26  [32] For example, a prospective "Owner-Operator" of a McDonald's franchise is offered 9-to-18 months training in a restaurant, as well as seminars, conferences, and one-on-one training. McDonald's® "World-Class Training", *http://corporate.mcdonalds.com/mcd/franchising/*

27  *us_franchising/why_mcdonalds/world_class_training.html* (last visited April 3, 2017).  Likewise, Subway informs potential owners that "all of our new franchisees attend a two week training course

28  at our World Headquarters, or one of our many training centers around the world."  Subway® Franchise FAQ, *http://www.subway.com/en-us/ownafranchise/franchisingfaqs* (click "6. Will there be training and support?") (last visited April 3, 2017).

12

1   are these types of provisions wholly consistent with an independent contractor or franchise

2   agreement,[33] but they also do not mandate the manner and means by which a Distributor performs

3   services.  That Flowers must approve a potential Distributor with whom it will enter into a contract,

4   as it would approve any third-party vendor before executing an agreement, or that Flowers can

5   decide how many territories to sell to a Distributor, are likewise irrelevant.[34]

6         Similarly, Plaintiffs argue that Flowers somehow indirectly controls the Distributors through

7   customer requirements like days of service, service windows, rotation of product, and product

8   placement.  Mot. at 7-9.  Such expectations are set by the customers and apply to *all* bread

9   vendors—they are not unique to Flowers' Distributors.  (*See, e.g.*, CE31, Sotomayor Tr. 108:13-

10  112:16.)  As Judge Klausner pointed out, "the Distributor Agreement by its own terms requires

11  deliveries to comply with the *customer's* requirements—it does not grant Defendants a right of

12  control."  *Martinez* Order at 12 (emphasis in original).  Thus, "to the extent the stores may impose

13  their own conditions, such does not determine the issue of whether [Flowers] 'controls' its

14  distributors."  RJN, Ex. B (*Kaewsawang*, p. 23 (internal citation omitted)).  Even if customer

15  expectations were pertinent to the analysis, each Distributor's territory contains a different

16  configuration of accounts, making individualized inquiries necessary.  SE16; *see also Martinez*

17  Order at 12 (noting "driver declarations indicate that their schedules varied based on specific

18  territories and customer expectations").  Further, Plaintiffs and other Distributors admit that they can

19  and do change product placement and days of service from time to time.  (CE3, Fernandes Decl. ¶

20  24; CE20, Brownfield Tr. 140:21-141:3; CE22, N. Hernandez Tr. 58:13-20.)

21              **(d)    Alleged Monitoring Does Not Show a Uniform Right of Control
                        Over the Manner and Means**

22         Finally, Plaintiffs argue that Flowers attempts to "control" Distributors by monitoring and

23  directing their activities.  However, as Judge Klausner recognized, "nothing in the contract specifies

24  that Defendants have any right to control drivers through supervision or monitoring.  In the absence

25  of a uniform policy, then, the Court must consider whether Defendants' practice demonstrates a

---

26  [33] *Freund v. Hi-Tech Satellite, Inc.,* 185 F. App'x 782, 784 (11th Cir. 2006) (installers were

27  independent contractors because, "although [they] did not set the prices, [they] were 'no less in control of their net profits as a result of these variables.'").

28  [34] At best, this evidence relates to protecting the brand, which is consistent with independent contractor status and which does not control the "manner and means" by which a franchisee operates their business.  *Cislaw v. So. Corp.*, 4 Cal. App. 4th 1284, 1295-96 (1992).

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

1   right to control."  *Martinez* Order at 12 (internal citations omitted).  Plaintiffs try to compensate for

2   the lack of a uniform policy by asserting that Flowers has a "common management system" under

3   which BSMs are purportedly directed to monitor and control the activities of Distributors.  Mot. at 9.

4   However, this argument is predicated largely on a written job description for BSMs that, according

5   to Flowers management, was never implemented and misstates the responsibilities of BSMs.

6   (CE25, Wilson Tr. 229:3-21; 231:9-234:9.)  Even Plaintiffs' own declarant, former BSM Al

7   Sotomayor, explained that BSMs "were instructed to treat [the Distributors] as business partners"

8   and were reminded by their superiors that BSMs could not dictate how Distributors operate their

9   businesses.  (CE31, Sotomayor Tr. 60:13-62:19; 102:8-17; 106:15-22; 107:15-108:9.)  Nor is there

10   any merit to Plaintiffs' purely semantic argument that the computerized collection of sales and

11   inventory information, or visits to customer stores to assess how the Flowers brand is being

12   merchandised and presented in the market, is a form of "ubiquitous monitoring" that equates to

13   supervision of the details of Distributors' work.  Mot. at 9.[35]

14           For their part, Plaintiffs and other Distributors have submitted contradictory testimony

15   regarding whether, when, and to what extent Flowers' managers "monitored" them, ranging from a

16   Distributor like Soares who claims a BSM constantly gave him suggestions, to a Distributor like

17   Michael Fernandes who could go weeks without speaking to a BSM.  (CE26, Soares Tr. 89:2-23;

18   174:9-20; 177:2-11; CE3, Fernandes Decl. ¶ 15.)  In fact, Soares *complained* to Flowers about the

19   disparate treatment of Distributors.[36]  Also, even if some Distributors believed that they were being

20   monitored or being told what to do, many others acknowledge that they run their businesses

21   independently and reject the BSMs' suggestions.  SE27.[37]  Given these facts, the Court's inquiry

22

23   _____

[35] As Flowers' 30(b)(6) witness explained, "Obviously, we have plenty of tracking to try and help

24   the distributor grow his business, and part of that is selling fresh product.  And so we're trying to
     make sure that the distributor has every opportunity to use the tools that he has, the ordering
     capabilities, the handheld, his personal knowledge."  (CE_, Wilson Tr. 138:14-24.)  *See also*

25   *Patterson v. Domino's Pizza, LLC*, 60 Cal. 4th 474, 490-91 (2014) (observing that the "franchise
     arrangement puts the franchisee in a better position than other small businesses" since it "gives him
     access to resources he otherwise would not have, including the uniform operating system itself").

26   [36] *See* CE26, Soares Tr. 64:1-4 ("Q: And so was the purpose of sending this to Manny and Carl to
     tell them that you were being treated differently from other distributors?  A:  Yes."); *see also* CE28,

27   Mawyer Tr. 121:19-122:8 (testifying that a BSM "retaliated" against him after Mawyer hired and
     then fired the BSM's son—"Q: Those are things that [the BSM] did not do to other distributors?  A:
     Correct.").

28   [37] *See also* CE1, Barr Decl. ¶ 13 ("When I have been given a suggestion or recommendation, I don't
     always do it.  When I told the Branch Sales Manager no, he understood that I was aware of my
     store's activity and it was up to me."); CE2, Cardoza Decl. ¶ 26 ("I do not always do what my

1    "necessitates individualized examination because different drivers experienced varying degrees of

2    supervision." *Martinez* Order at 12.

3         Plaintiffs' contention that Flowers uses "breach" letters to control the Distributors likewise

4    does not evidence a right of control over the manner and means of the Distributors' operations,

5    much less a *uniform* right of control.  Ignoring for the moment that the existence of breach letters

6    confirms that Flowers cannot terminate the DA at-will (a key distinguishing factor from *Ayala,*

7    *supra*), the breach letters at most show a level of control over the end product of the work, not the

8    manner and means by which Defendants' operate—and, in fact, Section 16.1 of the DA prohibits

9    Flowers from controlling the manner and means of Distributors' work.[38]  If anything, breach letters

10   demonstrates the need for individualized inquiries, given that Flowers' decision to issue a breach

11   letter is the result of a case-by-case assessment of the circumstances that depends on various factors,

12   including the severity of the situation.  SE30[39]; (CE7, Rich Decl. ¶¶ 6-8.)

13              **(e)    The Record Confirms the Need for Individualized Inquiries**

14        The material differences in the relationships between Flowers and the Distributors also

15   preclude a finding of predominance.  Here, the record confirms stark differences in how

16   Distributors: use helpers or employees (SE7), engage in other business activities (SE5), set their

17   own hours and schedules (SE10), decide what products to order (SE13), service their accounts

18   (SE14), and increase sales (SE17-21).  These and many other facts demonstrate Flowers' *lack of*

19   *uniform control.*

20        Where, as here, individualized inquiries overwhelm the analysis, courts routinely deny class

21

22   Branch Managers ask me to do. . . ."); CE3, Fernandes Decl. ¶ 16 ("The Branch Sales Manager
     might make some recommendation to me but I am not required to follow them. . . . Normally I do
     what I want to do."); CE4, Silveira Decl. ¶ 21.

23   [38] Consider the example of a Distributor who received a breach letter because he or she repeatedly
     failed to deliver the products that a customer wanted, thereby failing to "maintain[s] proper service

24   and delivery . . . in accordance with [the customer's] requirements." (CE5 ¶ 7; CE6 ¶¶ 2.6).  As
     Judge Klausner found, "[s]uch a broad standard does not delineate the specific conduct that drivers

25   must follow, nor does it demonstrate Defendants' supposedly vast and uniform control over class
     members." *Martinez* Order at 12.  In this situation, the Distributor controlled the manner and means

26   by which the products were delivered and could have met the customer's expectations various ways,
     including performing the services personally or having a helper deliver the product.  To the extent a

27   breach letter was issued, it related to whether a customer's needs were met (the end result), not *how*
     they were met (the manner and means).  (CE25, Wilson Tr. 189:1-3 ("Q: And whether it's done by
     the distributor or if they hire an agent to do it, you don't care?  A: True.")

28   [39] *See also* CE27, Botelho Tr. 176:3-7 (has never received a breach letter); CE29, Marchand Tr.
     171:7-173:23 (received one breach letter for out of code product at a store that he agrees was in
     violation of the "Good Industry Practice" provision of the Distributor Agreement).

                                      15                           Case No. 3:15-cv-04918-JSC
     DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

certification.  *Narayan v. EGL, Inc.*, 285 F.R.D. 473, 478 (N.D. Cal. 2012) (predominance not satisfied because although the company may have "standardized many if not all of its relationship" with independent contractors, "the [e]vidence shows that . . . class members were situated very differently"); *Sherman v. Am. Eagle Ex., Inc.,* 2012 WL 748400, at *12 (E.D. Pa. Mar. 8, 2012) (same).[40]  Indeed, the district court in *Martinez* denied a nearly identical motion for class certification, finding that "individual issues predominate as to the question of whether Defendants improperly classified class members as independent contractors instead of employees."  *Martinez* Order at 14.  The trial court in *Kaewsawang v. Sara Lee Fresh, Inc.*, another case involving a similar business model, similarly reasoned: "there are drivers with single or multiple routes, absentee owners . . , drivers who have no employees and those with multiple employees.  This is not to say that there are no similarities or minimal standardization; rather, there is simply no 'predominate' common question."  RJN, Ex. B (p. 20).

Ultimately, even if Plaintiffs could establish some amount of uniform control, this "does not automatically signify that common issues predominate.  Rather, the Court must consider the entire record in conjunction with all aspects of Plaintiffs' occupation to determine where common issue[s] predominate."  *Martinez* Order at 13.  Here, as in *Martinez*, it is clear that "individual issues predominate over any commonalities."  *Id.*

(f)     ***Borello's*** **Secondary Factors Likewise Require Individualized Inquiries**

The fact that the *Borello* secondary factors cannot be addressed by common evidence also

---

[40] The class certification decisions cited by Plaintiffs at page 2 of their brief are clearly distinguishable.  Most importantly, Plaintiffs do not explain why this Court should follow the decision in *Rehberg*, which was entered by a North Carolina court applying a different legal test and claims (including unpaid overtime), rather than the decision in *Martinez*, which was entered by a California district court applying the same legal test and the same claims.  *Rehberg* also involved starkly different facts, including, *inter alia*, no absentee or multiple territory distributors and much less evidence of entrepreneurial or sales opportunities actually exercised by the proposed class members.  *Rehberg v. Flowers Baking Co. of Jamestown*, 2015 WL 1346125 (W.D.N.C. Mar. 24, 2015).  Likewise, *Villalpando v. Exel Direct, Inc.*, involved much greater evidence of uniform control by the defendant, including the right to terminate without cause and requirements that the drivers wear uniforms, have corporate logos on their truck, drive the exact route they were assigned each day, obtain permission before using a helper, and various other facts.  303 F.R.D. 588, 591-97 (N.D. Cal. 2014).  **None of these facts are present here.**  The other authority – including *Ruiz* and *Alexander* – suffers from this same infirmity.  *See Alexander v. FedEx Ground Package Sys., Inc.*, 765 F.3d 981, 989-995 (9th Cir. 2014) (defendant exercised control through "detailed appearance requirements," requirement that vehicles bear logos, ability to reconfigure routes, and other ways); *Ruiz v. Affinity Logistics Corp.*, 754 F.3d 1093, 1101-1103 (9th Cir. 2014) (defendant "controlled the equipment—the trucks, tools, and mobile phones—and the helpers the drivers used," required drivers to wear uniforms, retained right to terminate without cause, etc.).  If anything, these cases demonstrate that class treatment is not justified here**.**

justifies the denial of Plaintiffs' Motion.

*First,* Flowers cannot terminate the DA at will.  Rather, "provided DISTRIBUTOR faithfully carries out the terms hereof," Flowers can only terminate it after following the breach of contract provisions or under other very limited circumstances.  (CE5 ¶ 7, CE6 ¶¶ 3.1(b)(c), 17.1.)  Thus, Plaintiffs cannot demonstrate this factor from common evidence because the common evidence they identify (the DA) establishes that Flowers could <u>not</u> terminate the DA at will.

*Second*, whether each Distributor is engaged in a distinct occupation or business cannot be determined without inquiring into the circumstances of each Distributor, including whether they work only for Flowers or use helpers to operate their territories.  Since Flowers "do[es] not possess any right to control a class member's process of hiring and utilizing helpers or sub-drivers," Distributors and their corporations can and do pursue other business opportunities.  *Martinez* Order at 13; (*see also* CE5, Wilson Decl. ¶ 12.)  Thus, Plaintiffs cannot demonstrate this factor with common evidence, as Judge Klausner previously found, which provides additional grounds for denying certification.  *Id.*; *see also Spencer v. Beavex, Inc.*, 2006 WL 6500597, at *16 (S.D. Cal. Dec. 15, 2006) (denying class certification due to distinct business factor); *Narayan*, 285 F.R.D. at 478 (same).  In fact, the evidence establishes that some Distributors do engage in a range of distinct business activities.  SE5.

*Third*, *Borello's* level of skill and opportunity for profit or loss factors cannot be resolved by common evidence because of the independence and entrepreneurial opportunities afforded to Distributors.  *See Sotelo v. Media News Grp., Inc.*, 207 Cal. App. 4th 639, 658-59 (2012) ("opportunity for profit" factor requires individualized inquires).

*Fourth*, there is variation in Distributors' "investment in equipment or materials required for the task."  The amount of each Distributor's initial investment (*i.e.*, purchase price) in his distributorship varies significantly.  (CE5, Wilson Decl. ¶ 4).  Likewise, Distributors invest in different things in different ways, including helpers, displays, trucks, advertising, and other activities.  SE24.

*Fifth*, whether Flowers or the Distributor supplies the instrumentalities, tools, and place of work under *Borello* presents individualized inquiries.  For example, some Distributors purchase

1   trucks through a source recommended by Flowers, others don't.[41]  Some Distributors admit Flowers

2   not place any restrictions on the appearance of their vehicles, others claim it does.[42]  Some

3   Distributors wear plain clothing, others wear clothing with the logos of Flowers' products, and

4   others wear clothing with the name of their own business.  SE23.

5        *Sixth*, determining whether each Distributor and Flowers believed they were creating an

6   employer-employee relationship requires nothing short of a sworn statement from each individual

7   Distributor.

8        ### 2.   Determining When a Given Distributor "Personally Serviced" a Territory Also Requires Individualized Inquiries

9        The need for individualized inquiries is increased by Plaintiffs' proposed class definition,

10  which encompasses "[a]ll persons who have personally serviced a territory in Northern California"

11  since February 25, 2013.  Mot. 1.  Not only do Plaintiffs fail to explain what would qualify as

12  having "personally serviced a territory," the record confirms that whether a Distributor services his

13  or her territory varies significantly and changes over time, ranging from an absentee owner like

14  William Powell who used a helper to run his territory full-time while he started another business

15  (CE30, Powell Tr. 121:3-21), Michael Fernandes who hired a full-time employee to service the

16  territory he jointly owns (CE3, Fernandes Decl. ¶ 10), and Carlos Garibay who, over the last three

17  years, has worked full-time as a San Jose Policeman.  (CE21, Garibay Tr. 144:9-146:4; 255:18-

18  255:25.)  These are not isolated examples, as shown by the depositions of Plaintiffs and other

19  Distributors, all of whom used helpers and some of whom admitted holding other full-time jobs.[43]

20       As Plaintiffs' definition acknowledges, the Court must determine whether each Distributor

21  "personally serviced" a territory in order to include them in the proposed class.  However, the trier

22  of fact must also determine *when* each Distributor "personally serviced" a territory to resolve any of

23  Plaintiffs' claims, starting with the threshold issue of employment status since Plaintiffs have not

24  explained how a Distributor could be Flowers' employee during weeks or months when he or she

25

26  ---

[41] *See, e.g.*, CE27, Botelho Tr. 147:21-148:6, 265:11-266; CE2, Cardoza Decl. ¶ 50; CE26, Soares Tr. 111:12-23, 172:14-173:4, 260:4-18, 262:12-19; CE3, Fernandes Decl. ¶ 35.

27  [42] *See, e.g.*, CE27, Botelho Tr. 179:17-20; CE21, Garibay Tr. 149:24-151:12; CE19, M. Hernandez Tr. 140:1-14; CE22, N. Hernandez Tr. 229:12-20; CE20, Brownfield Tr. 191:21-24.

28  [43] *See, e.g.*, CE27, Botelho Tr. 211:5-212:2; CE20, Brownfield Tr. 34:14-35:10, 205:12-206:21; CE2, Cardoza Decl. ¶¶ 13-14; CE21, Garibay Tr. 144:9-146:4; 255:18-255:25; CE18, Herrera Tr. 91:6-25, 95:24-96:8, 96:21-97:11, 100:7- 102:1-11; CE26, Soares Tr. 165:25-168:21.

did not perform services for Flowers.  Consequently, Plaintiffs' definition creates issues of "fluid class membership" that will require yet another layer of individualized inquiries.  *See Colapinto v. Esquire Dep. Servs., LLC*, 2011 WL 913251, at *9 (C.D. Cal. Mar. 8, 2011); *Narayan*, 285 F.R.D. at 481 (class definition flawed because a "driver who hired his brother for three months while on vacation would become a member [of the sub-class] for that period of time").

Despite the need to determine whether and when each Distributor "personally serviced" a territory, Plaintiffs fail to address how the parties—and the Court—can ascertain when a Distributor was or was not part of the proposed class.  <u>This is because they can't</u>.  Flowers, which does not track and may not even know that a Distributor is using helpers, does not have any way of determining when a Distributor "personally serviced" their territories over the last four years.  (CE5, Wilson Decl. ¶¶ 8-9); SE9.  Consequently, attempts to determine whether or when each Distributor was a member of the class would *necessarily require* individualized testimony from one hundred and fifty putative class members, precluding certification.  *See Spencer*, 2006 WL 6500597 at *9 (class definition that sought to exclude "drivers who provided more than 51% of their services to [defendant] by using their own employees or subcontractors" not certifiable).  As Judge Klausner recognized, "given the practical reality and inherent complexity of ascertaining individual class members where no reliable documentary evidence exists," "the Court is left to rely on piecemeal anecdotal evidence and individual [Distributors'] memories dating back three years."  *Martinez Order* at 8.  Here, as in *Martinez*, the impossibility of determining when each Distributor "personally serviced" a territory requires the denial of Plaintiffs' motion.[44]

### 3.  <u>Plaintiffs' Labor Code Claims Present Individualized Inquiries that Cannot Be Answered on a Classwide Basis</u>

Even if Plaintiffs could establish that the threshold issue of employment status was certifiable, their failure to show that the underlying Labor Code claims can be resolved with

---

[44] In *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1127 (9th Cir. 2017), the Ninth Circuit ruled that plaintiffs need not show that there is an administratively feasible mechanism for ascertaining class members in order for a class to be certified.  Flowers contends that the lack of an administratively feasible mechanism to certify this class is an independent basis for denying certification, and raises this argument to preserve it should the Supreme Court grant certiorari and reverse *Briseno*.  Regardless, *Briseno* explains that "Rule 23's enumerated criteria already address" the judiciary's concerns regarding unascertainable classes.  *Id.* at 1127.  Here, Plaintiffs cannot satisfy Rule 23's requirements (including commonality, predominance, and superiority) because of the individualized inquiries needed to identify each Distributor and to determine when each Distributor "personally serviced" a territory.

common proof serves as an *independent basis* upon which to deny their Motion.  *See Ruiz v. Affinity Logistics Corp.*, 2009 WL 648973, at *6 (S.D. Cal. Jan. 29, 2009) (common proof of misclassification insufficient to certify Labor Code claims).

Whether a given Distributor can recover **business expenses** under Labor Code § 2802 will depend on whether they were *already* indemnified for those amounts.  *Gattuso v. Harte-Hanks Shoppers, Inc.*, 42 Cal. 4th 554, 573 (2007) (companies can satisfy their Section 2802 obligations "through an increase in base salary or in commission rates (or an increase in both salary and commission rates)").  Here, many Distributors understood when they purchased their territories that they would receive an *enhanced* discount and that the discount was intended to cover their expenses.  SE31.[45]  As such, individualized inquiries would be necessary to determine whether, *inter alia*, the Distributor had a means to apportion the payments between expenses and labor and whether the Distributor *actually earned enough* to cover both their expenses and labor.

Individual inquiries will be required to determine whether the expenses sought by Plaintiffs were reasonable and necessary—or were even incurred.  For example, Botelho purchased a device so he could submit invoices from home rather than doing it at a Flowers' facility, whereas most other Distributors did not incur that expense.  (CE27, Botelho Tr. 213:24-214:21.)  Likewise, some Distributors already owned vehicles when they purchased their territories, others purchased new or used vehicles, and others leased vehicles.  SE22.[46]  For this reason, courts in California have found that expense reimbursement class claims are inherently problematic because "there may be substantial variance as to what kind of expenses were even incurred by [the putative employees] in the first place."  *Harris v. Vector Mktg. Corp.*, 753 F. Supp. 2d 996, 1022 (N.D. Cal. 2010).  This is particularly problematic here given that some Distributors admit they do not keep receipts of their expenses, others, like Soares, admit they did not segregate their business expenses from the personal expenses in their bank records, and others, like William Powell, used the same bank account to pay expenses for his distributorship and his concrete company.  (CE19, M. Hernandez Tr. 190:18-25;

---

[45] *See, e.g.*, CE3, Fernandes Decl. ¶ 39 ("I understand that the earning from my sales are intended to compensate me 100% for all of the costs of running my business and not just for the hours that I work.  My earning cover all of my expenses.  On average my profit margins are 21% while the competition is at approximately 6%."); CE2, Cardoza Decl. ¶ 6;. CE27, Botelho Tr. 124:17-127:12; CE19, M. Hernandez Tr. 91:19-92:4; CE18, Herrera Tr. 121:11-122:14.

[46] *See, e.g.*, CE19, M. Hernandez Tr. 137:23-139:25; CE26, Soares Tr. 111:12-23, 172:14-173:4, 260:4-18, 262:12-19.

1    CE26, Soares Tr. 268:22-269:12; CE30, Powell Tr. 116:20-117:6.)[47]

2        Plaintiffs' claim for **unlawful deductions** under Labor Code § 221 is also not subject to

3    common proof.  Although Plaintiffs presume that all deductions are unlawful, Section 221 only

4    prohibits unauthorized deductions from "wages," which is defined as "all amounts for ***labor***."[48]

5    Furthermore, another provision of the Labor Code (Section 224) allows employer to make

6    deductions when "empowered to do so by state or federal law" or when "expressly authorized in

7    writing."  Thus, the Court would be required to engage in the same types of individualized inquiries

8    required by Plaintiffs' expense reimbursement claim, including whether a Distributor's gross

9    earnings were for labor only, or included amounts for both labor and deductions/expenses like

10   warehouse fees.  There is also evidence in the record that some Distributors authorized those

11   deductions in writing, requiring another layer of individualized inquiries.  SE33.[49]

12       Plaintiffs' claim for **inaccurate wage statements** under Labor Code § 226 claim fares no

13   better.  Although some Distributors state that the "Settlement Statements" they receive each week

14   are accurate, others claim they are inaccurate, and others claim they are not sure of their accuracy

15   (SE34), Plaintiffs nevertheless contend that all such documents are "inaccurate" because they do not

16   list the "total hours worked by the employee."  Mot. 23.  But this, too, cannot be answered with

17   common proof since whether this information was even required depends on whether the Distributor

18   performed services during a particular week.

19       Finally, Plaintiffs' **meal and rest period claims** fail because they cannot establish through

20   common proof that Distributors were both entitled to breaks and forced to forego them.  *See Norris-*

21   *Wilson v. Delta-T Group, Inc*., 270 F.R.D. 596, 609 (S.D. Cal. 2010) (certification of independent

22   contractor claims by itself does not warrant certification of meal and rest period claims); *Dailey v.*

23   *Sears, Roebuck & Co*., 214 Cal. App. 4th 974, 1002 (2013) (noting that "the absence of a formal

24   written policy . . . does not necessarily imply the existence of a uniform policy or widespread

25

26   ───────────────────────
     [47] Whether and to what extent Distributors took tax write-offs for their businesses' expenses varies
27   from person to person (SE32) and is an individualized inquiry because it will impact recoverable
     damages.
     [48] As such, if the gross earnings were intended to compensate a Distributor for their labor and
28   expenses, the deductions would be permissible.
     [49] *Compare* CE26, Soares Tr. 265:19-266:13; CE20, Brownfield Tr. 252:22-253:20; *with* CE18,
     Herrera Tr. 227:9-228:22 (claims he authorized deductions under duress).

1    practice").  While Plaintiffs and Distributors admit that no one at Flowers ever prevented them from

2    taking breaks, some Distributors report that they rarely took time for breaks or lunch, while others

3    confirm that they could and did take breaks.  SE36-37.[50]  Whether a Distributor even worked long

4    enough to be entitled to a meal period or rest break also varies by Distributor and day.  SE35.  This

5    evidence falls far short of showing that an entire class was forced to miss meal and rest periods.

6         **B.    Plaintiffs Cannot Establish Rule 23(b)(3) Superiority.**

7         As shown above, common questions do not predominate over individual issues due to the

8    fact-intensive nature of Plaintiffs' claims.  However, Plaintiffs also have not shown that a class

9    action is superior in light of: (a) the proposed class members' interests in individually controlling

10   separate actions; (b) the extent and nature of any preexisting related litigation; (c) the desirability of

11   concentrating the litigation of the claims in the forum; and (d) manageability.

12        **1.    A Class Action Is Unnecessary Because Individual Actions Are Available and, in Fact, Already Pending**

13        A class action is not necessary because Plaintiffs' claims are worth hundreds of thousands of

14   dollars per person, with Plaintiffs' declarant Thurmond Mawyer testifying *that his reimbursement*

15   *claim alone* is worth more than $200,000.  (CE28, Mawyer Tr. 223:8-10.)  Distributors have ample

16   incentive to file their own lawsuits—*and have done so*—with twenty-six Distributors filing separate

17   lawsuits against Flowers, including eighteen in a single action. CE8, Chemers Decl. ¶¶8-11; CE13-

18   17.  Not surprisingly, given the high value of their claims, Distributors have no problem finding

19   legal representation, as shown by the fact that at least five plaintiff's firms are currently representing

20   Northern California Distributors.  *Id.*  Thus, the proposed class members have an interest in

21   controlling their separate actions and are capable of banding together without resorting to class

22   action procedure, with nearly 30 Distributors (representing 20% of the proposed class) filing their

23   own lawsuits.[51]  Furthermore, other Distributors *do not* want to be involved in this litigation.  (*See,*

24   *e.g.*, CE3, Fernandes Decl. ¶ 45 ("I think [the *Soares* lawsuit] is ridiculous and I hope the plaintiffs

25

26   ───────────────
     [50] *See, e.g.*, CE1, Barr Decl. ¶ 22 ("I can take breaks in the middle of the day and do so."); CE4, Silveira Decl. ¶ 34 ("I will stop and get something to eat or stop and take a 15 minute break.); CE18, Herrera Tr. 273 19-274: 1; CE23, Tavarez Tr. 225:4-8.

27   [51] The other Distributors' interest in controlling their separate actions is demonstrated by the different types of claims that they are pursuing.  For example, while Plaintiffs are pursuing only

28   Labor Code claims, Anthony Porreca and other Distributors are pursuing business-related claims against Flowers, including conversion and misrepresentation, on behalf of both themselves and their businesses.  CE8, Chemers Decl. ¶¶ 8; CE13-14.

fail.")  Thus, a class action is not superior because the remaining Distributors either do want to be

involved or can bring their own lawsuit.  *See Zinser v. Accufix Research Inst., Inc*., 253 F.3d 1180,

1190-1192 (9th Cir. 2001) (agreeing that class treatment was not superior where claims had value of

at least $50,000 and separate lawsuits were already pending).

**2.     A Class Action Is Not Superior Because Class Members Would Have to Litigate Numerous and Substantial Individual Issues**

Class adjudication of the employment status of Distributors is also not superior because,

even assuming there were common questions of law and fact:

> Every individual driver's particular case would essentially need to be
> relitigated after the determination of the common questions of fact
> and law.  Moreover, the *Borello* factors are not to be viewed in
> isolation, but in conjunction.  The Court does not find that it would
> be of value to resolve some *Borello* factors by class action, and
> others by individual inquiry; attempt to combine the factors in order
> to reach a determination of each individual driver's status as
> employee or independent contractor, and then determine the issue of
> each driver's eligibility for [the underlying state law claims].

*Spencer*, 2006 WL 6500597 at *16.  The same is true here, as shown by the very different testimony

of Michael Fernandes (who is adamant he has been treated like, and wants to remain, an independent

businessman) and Plaintiffs (who submit they were treated like employees).  In addition to the

inefficiencies caused by the employment status issue are the individualized assessments needed to

resolve Plaintiffs' Labor Code claims.  Consequently, the Court would be required to conduct 150

"mini-trials" as to each Distributors' employment status and additional "mini-trials" to resolve each

of their claims.  "If each class member has to litigate numerous and substantial separate issues to

establish his or her right to recover individually, a class action is not 'superior.'"  *Zinser*, 253 F.3d at

1192.

**3.     A Class Action Is Not Superior Because No Trial Plan Exists.**

Plaintiffs' failure to propose a suitable trial plan further demonstrates that a class action is not

superior.  Although Plaintiffs must show "a suitable and realistic plan for trial of the class claims"

that will not deprive Defendants of their rights to assert defenses as to each class member, Plaintiffs

fail to present any trial plan, instead simply pointing to a variety of procedural devices that they

could use, without identifying any specifics, and pointing to the same supposedly "common policies

and practices" that doom all of their claims.  *Zinser*, 253 F.3d at 1189; *Dukes*, 131 S. Ct. at 2546.

Plaintiffs have utterly failed to show that their claims are manageable, particularly given the ample evidence their claims raise a host of individualized inquiries.  Plaintiffs have not even posed, let alone answered, the numerous questions that would need to be resolved at trial, including:

- How can the employment status of one hundred and fifty Distributors be resolved without resorting to the type of "trial-by-formula" that the Supreme Court warned against in *Dukes*, 131 S. Ct. at 2561?
- How will the trier of fact determine whether or when each Distributor "personally serviced" a territory?
- What business expenses is a Distributor who owns two territories entitled to recover?
- What business expenses (if any) is a Distributor who uses a helper to run his territory entitled to recover?
- How will the trier of fact determine whether a given Distributor authorized the allegedly unlawful deductions?
- Are absentee Distributors entitled to wage statement penalties for the weeks or months that they performed no work?
- How will the trier of fact determine whether or when a Distributor worked enough hours on a given day to be entitled to a meal period or rest break?
- How will the trier of fact evaluate the value of each Distributor's territory and how should this equity be used to offset each Distributor's purported damages?

While the above list is not intended to be exhaustive, it demonstrates how Plaintiffs' claims cannot be resolved without significant individualized inquiries, rendering a class action unmanageable.

**C.**     **Plaintiffs Are Not Adequate Representatives and Their Claims Are Not Typical**

Even if they could establish commonality, predominance, and superiority (and they cannot), Plaintiffs do not meet the adequacy and typicality requirements because their interests are incompatible and their experiences are not typical of most putative class members.  Under subsections (3) and (4) of Rule 23(a), Plaintiffs must show they "will fairly and adequately protect the interests of the class" and that their claims "are typical of the claims or defenses of the class." F.R.C.P. 23(a)(3)-(4).  The adequacy and typicality requirements "tend to merge." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 626 (1997).

Crucially, a plaintiff cannot adequately represent a class when, as here, he or she "seeks relief which the class members do not want." *Alberghetti v. Corbin Corp.*, 263 F.R.D. 571, 578 (C.D. Cal. 2010).  Although Plaintiffs challenge the franchise model, other Distributors confirm that they *do not* want to be employees and, in fact, purchased territories because they wanted to own a

1  business and build equity[52]—an opportunity Plaintiffs' lawsuit would deny them.  (CE4, Silveira

2  Decl. ¶ 54 ("I want to continue to be an independent business person so this lawsuit worries me.")

3  Because Plaintiffs seek an outcome that is fundamentally at odds with the desires of other putative

4  class members, they are inadequate representatives.

5       Plaintiffs' claims are also not typical of the proposed class, as shown by the strikingly

6  different statements submitted by Plaintiffs (who describe themselves as mere "delivery drivers")

7  and other Distributors (who attest to their status as business owners).  (*Compare* Botelho Decl. ¶ 13

8  with CE3, Fernandes Decl. ¶ 8.)  While Plaintiffs seek to represent one hundred and fifty

9  Distributors who worked out of sixteen locations throughout Northern California, Plaintiffs have not

10  demonstrated that their own claims extend to these non-parties, particularly when the Motion is

11  largely supported by their own declarations and the declarations of two former BSMs (all of whom

12  worked out of the San Jose warehouse).  Indeed, Soares testifies that he was treated *differently* than

13  other Distributors, including that Flowers closely monitored his accounts and repeatedly issued

14  breach letters to him for excessive out-of-code product, while refraining entirely from monitoring or

15  addressing another Distributor's out-of-code product even after Soares sent Flowers a series of

16  pictures showing that this other Distributor routinely had significant volumes of out-of-code product

17  in his accounts.  (CE26, Soares Tr. 63:6-64:13.)

18  **V.    CONCLUSION**

19       For the foregoing reasons, Flowers respectfully requests that this Court deny Plaintiffs'

20  Motion for Class Certification.

21  DATED:  April 3, 2017                         OGLETREE, DEAKINS, NASH, SMOAK &
                                                   STEWART, P.C.
22

23                                               By: */s/ Alexander M. Chemers*
                                                   Alexander M. Chemers
24                                                 Attorneys for Defendants

25                                                                            29288932.6

26

27  _____
    [52] SE38; *see, e.g.*, CE1, Barr Decl. ¶ 8 ("What I enjoy most about my business is being independent
28  and knowing that if I want to hire someone to do my job, I can."); CE3, Fernandes Decl. ¶ 9 ("The
    freedom is what I enjoy most about my distributorship – that and the fact that I make really good
    money."); CE4, Silveira Decl. ¶ 8 ("When I bought my distributorship, I intended to become an
    independent contractor.  That was the whole point.").