UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MARK SOARES, et al.,

          Plaintiffs,

   v.

FLOWERS FOODS, INC., et al.,

          Defendants.

Case No. 15-cv-04918-JSC

**ORDER RE: MOTION FOR CLASS CERTIFICATION**

Re: Dkt. No. 61

      Plaintiffs in this putative class action are distributors who delivered baked goods for Defendants Flower Foods, Inc., Flowers Baking Co. of California, Flowers Baking Co. of Modesto, and Flowers Bakeries Brands, Inc. (together, "Defendants" or "Flowers"). Plaintiffs assert California wage and hour claims based on the allegation that Flowers misclassified its distributors as independent contractors/franchisees rather than employees. Now pending before the Court is Plaintiffs' motion for class certification. (Dkt. No. 61.[1]) Having considered the parties' submissions, and having had the benefit of oral argument, the Court DENIES Plaintiffs' motion as individual issues predominate and a class action is not superior to individual actions.

**BACKGROUND**

**I.    Factual Background[2]**

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

[2] The background is based on the exhibits from Plaintiffs' motion, those attached to Defendants' "Compendium of Evidence" (Dkt. No. 63), and judicially noticeable documents. Both parties filed Requests for Judicial Notice asking the Court to consider unpublished opinions from other district courts on motions for class certification in misclassification claims. (Dkt. Nos. 65, 68.) A court may take judicial notice of "matters of public record[,]" including relevant opinions of other courts. *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (citation omitted); *see, e.g.*,

United States District Court
Northern District of California

United States District Court
Northern District of California

Flowers and its network of subsidiaries "manufacture and/or distribute various bakery products, most of which are then distributed to retail stores, restaurant, fast food business, military and institutional accounts." (Dkt. No. 61-6 at 25; Dkt. No. 61-5 at 4.) Flowers uses distributors to move its bread products to stores in the segment of its business known as "direct store delivery." (Dkt. No. 61-6 at 234-235.) Flowers California began distributing its bakery goods throughout Northern California in February 2013.[3] (Dkt. No. 61-6 at 236.) For distribution purposes, Flowers divides its Northern California market area, which extends "from Visalia north to the Oregon Border and from the Pacific Coast to the Nevada border") into distribution territories, which individuals, called "Distributors," service.

Plaintiffs and the putative class members are Distributors who entered into written "Distributor Agreements" to provide distribution services in Northern California Flowers territories during the class period. Generally speaking, Distributors purchase the exclusive right to sell Flowers' products in given geographic territories and are responsible for delivering, displaying, and selling Flowers products in their areas. The named Plaintiffs began working for Flowers as Prospective Distributors in early 2013. Both became Distributors by entering into Distributor Agreements with Flowers later that year. Soares resigned from Flowers in May 2016.

---

*Murray v. Sears, Roebuck & Co.*, No. 09-cv-05744 CW, 2010 WL 2898291, at *1 n.1 (N.D. Cal. July 21, 2010) (in class action, taking judicial notice of court orders in a case pending before another court involving similar claims). However, the Court declines to consider Defendants' "Summary of Evidence." (Dkt. No. 64.) All factual background, including summaries highlighting differences among distributors' experiences working for Flowers, should have been included in Defendants' opposition itself. *See* N.D. Cal. Civ. L.R. 7-4 (requiring a brief or memorandum of points and authorities filed in opposition to a motion may not exceed 25 pages of text and must contain "[a] succinct statement of the relevant facts"); *see also* Civ. L.R. 3-4(c) (requiring papers submitted to the court for filing be double-spaced). By separately filing a 25-page, single-spaced Summary of Evidence Defendants flouted the Local Rules. If Defendants needed more pages to include the facts they thought necessary to resolution of Plaintiffs' motion, they should have sought leave to file excess pages. *See* Civ. L.R. 7-4(b).

[3] Defendants are Flowers Foods, Inc., the ultimate parent company, and a number of subsidiaries. Flowers California was established in 2013. (Dkt. No. 61-6 at 236.) Flowers California transferred its Northern California operations to Flowers Modesto in February 2014 and with the transfer assigned all of its Distributor Agreements. (Dkt. No. 61-3 at 12.) The Court refers to Flowers and its subsidiaries as Flowers.

1    Botelho still works as a Flowers Distributor.

2         A.     <u>Flowers' Business</u>

3         When Flowers first opened its Northern California business, it staffed its territories with

4    "Prospective Distributors," individuals hired by a third-party staffing agency that classified them

5    as employees.  Flowers defined "Prospective Distributors" as "Individuals training to become an

6    independent distributor for Flowers; and are not, and will not, become a Flowers employee in a

7    worker's capacity as a prospective distributor."  (Dkt. No. 67-2 at 158-159.) Flowers management

8    interviewed and selected the candidates, provided training—including a "Distributor College"—

9    and provided the trucks for their routes.  The parties dispute the scope of Distributor College and

10   training the Prospective Distributors received.  Plaintiffs state that they and other Prospective

11   Distributors attended a two week-long classroom program, were assigned to a route, and received

12   direct hands-on instruction and evaluation from a Branch Sales Manager or other managers, which

13   could include ride-alongs during deliveries.  (*See, e.g.*, Dkt. No. 67-2 191-193, 328-330.)  The

14   classroom component included a slide presentation with step-by-step instructions for Distributors'

15   daily activities, including loading products, packing bread trays, following customer schematics

16   for product placement, setting up promotional displays, rotating stock and pulling stale product

17   from the shelves, and returning stale product from the warehouses, and how to use the handheld

18   computer device that all Distributors must lease from Flowers to record their work.  (Dkt. No. 61-

19   5 at 91-472.)   Defendants, in contrast, cite evidence that even the individuals who attended the

20   training contend that aside from Flowers-specific practices—like color-coded ties for certain

21   packaging and the handheld computer system the company uses—they did not learn anything new

22   at the Distributor College that they did not already know from prior delivery jobs or learn anything

23   about how to run their businesses profitably.  (Dkt. No. 63-23 at 10-11; Dkt. No. 63-27 at 7-9;

24   Dkt. No. 63-29 at 8.)

25        At the end of the apprenticeships, beginning in the fall of 2013, Flowers offered certain

26   Prospective Distributors a Distributor Agreement based on their performance records and

27   customer service skills.  To work as a Distributor, the Prospective Distributors had to enter into

28   the Distributor Agreement and complete other necessary paperwork.  As discussed in detail below,

the Distributor Agreement involves the Distributor purchasing the distributorship from Flowers; Flowers classifies the distributorships as franchises and the Distributors as franchisees.  (*See* Dkt. No. 61-6 at 21.)

Flowers' Franchise Disclosure Document states that Flowers "orientation generally must be completed before you start your distributorship."  (*Id.* at 38.)  But other Distributors bought their routes and entered the Distributor Agreement without participating in Distributor College or the Prospective Distributor apprenticeship; they either bought their territories after the initial Flowers California roll-out or purchased territories from other Distributors.  Some of Defendants' declarants state that they received little, if any, training from Flowers.

However they came to own their territory, every Distributor did so only after signing Flowers' uniform Distributor Agreement.

B.     The Distributor Agreement

All putative class members' Distributor Agreements are materially the same.  The Distributor Agreement expressly defines the Distributor as "an independent contractor with the resources, expertise and capability to act as a distributor of [Flowers'] products in the Territory[.]" (Dkt. No. 61-6 at 56; *see also id.* § 16.1.)  It provides that Distributors "shall not be controlled by [Flowers] as to the specific details or manner of [ ] business" and that the Distributor's business is "separate and apart from" Flowers' business.  (*Id.* § 16.1.)

Under the Agreement, the Distributor purchases the right to distribute Flowers' products in a given territory.  (*Id.* § 2.4.)  As part of the arrangement, the Distributor agrees to purchase products from Flowers to re-sell to the stores within her territory.  (*Id.* § 8.1.)  The Distributor Agreement permits the Distributor to hire other people to service the route.  (*Id.* § 16.2.)  Flowers requires the Distributor—or other individuals he hires to deliver the products—to perform its services in accordance with "Good Industry Practice," which it defines in relevant part as:

> [T]he standards that have developed and are generally accepted and followed in the baking industry, including, but not limited to, maintaining an adequate and fresh supply of Products and Authorized Products in all Outlets requesting service, actively soliciting all Outlets not being serviced, properly rotating all Products and Authorized Products, promptly removing all stale Products and Authorized Products, maintaining proper service and

United States District Court
Northern District of California

> delivery to all Outlets requesting service in accordance with the Outlet's requirements, maintaining all equipment in a sanitary condition and in good safe working order, and operating the Distributorship in compliance with all applicable federal, state and local laws, rules and regulations.

(*Id.* §§ 2.6, 5.1, 5.2.)  The Agreement requires the Distributor to use "commercially reasonable best efforts" to maximize sales and distribute products in accordance with Good Industry Practice, which may include "full rack service" and will include cooperating with Flowers on its marketing and sales efforts, maintaining a clean and neat personal appearance, and complying with all customer requirements.  (*Id.* § 5.1.)  Failure to comply with these provisions could be a breach of the Agreement.  The Agreement prohibits Distributors from carrying other bakery products—*i.e.*, products of Flowers' competitors—but permits them to distribute non-competitive products.  (*Id.*)  When it comes to Flowers' bakery products, Flowers prohibits Distributors from selling stale products but agrees to repurchase a certain percentage of each Distributor's stale product.  (*Id.* § 12.2-12.3.)  The Distributor Agreement specifies that leaving out-of-code—that is, stale— products in the market is a material breach of the Agreement that could render it subject to termination.  (*Id.* § 12.1.)

Each Distributor agrees to obtain his own delivery vehicle and insurance and to keep it clean, professional, and safe.  (*Id.* § 9.1.)  Distributors agree to use certain of Flowers' "proprietary administrative services" for collecting sales data, creating sales tickets, preparing invoices, and communicating with Flowers, which refers to a handheld computer device Distributors lease from Flowers for an administrative fee.  (*Id.* §§ 10.1, 10.2)  Distributors also agree to be charged a fee for using Flowers' warehouse.  (*id.* § 11.1.)  At no cost, Flowers agrees to provide advertising material to Distributors, but Distributors may use other advertising material subject to Flowers' prior approval.  (*Id.* § 13.1.)  Distributors must adhere to promotions or feature pricing on chain accounts, for which Flowers—not the Distributors—set prices.  (*Id.* § 13.2.)

The Distributor Agreement permits Flowers to terminate the Agreement if a Distributor engages in certain enumerated activities deemed non-curable breaches or repeated curable breaches.  (*Id.* §§ 17.2, 17.3.)  It sets forth a procedure for other breaches by which Flowers gives the Distributor written notice of the breach and an opportunity to cure.  (*Id.* § 17.3.)

1     In addition to the Distributor Agreement, Flowers also offered a set of services to would-be

2  Distributors, including financing to purchase the territory—which most Distributors used—,

3  trucks to lease, and assistance incorporating their businesses, which the Distributor Agreement

4  required.

5     C.     <u>Distributors' Job Responsibilities and Defendants' Oversight and Control</u>

6     Once the Distributor Agreement and other paperwork have been completed, Distributors

7  may begin their work, which involves picking up Flowers bakery products from Flowers-owned

8  warehouses in Northern California and delivering them to customers in their geographic territory,

9  ensuring that all stores and restaurants on the route have a fresh supply of Flowers baked goods,

10  and removing stale products from the shelves.  Flowers does not require its Distributors to work

11  out of any specific site or location, although non-Company sites must be approved by Flowers; but

12  the company does require that Distributors pick up products from a Flowers warehouse.  (*See* Dkt.

13  No. 61-6 at 39.)  Flowers has a six-day code for its bread products—the bulk of Distributors'

14  product—with different color ties for each date.  Distributors rotate stock at the stores to ensure

15  that the older product is placed in the front of the shelves and to pull any product older than six

16  days old.

17     Defendants' evidence highlights differences among Distributors' experiences in a number

18  of areas.  By entering the Distributor Agreements, Distributors own the property rights to their

19  territories and can sell them for a profit; some Distributors hold onto their territories to service

20  them on a long-term basis, while others sell them for profit as the value increases.  Some

21  Distributors own a single territory, while others own more than one.  Some entered the Distributor

22  Agreements as the sole owner of their corporations, while others purchased with one or more

23  partners.  Some Distributors have sold all or part of their territories to others, while others have

24  retained the territories they initially purchased.   Some Distributors, like the named Plaintiffs,

25  "personally service" their routes—*i.e.*, run the routes in their territories themselves.  In contrast,

26  others—known as "absentee" Distributors—hire other individuals to service their entire route

27  while they hold other full-time jobs, run their businesses, or deliver goods for other companies.

28  Still others hire helpers to complete parts of their routes, to service their routes part of the time, or

1    to provide intermittent assistance with routes.  Flowers does not track or record when Distributors

2    use helpers or, more generally, who serviced a route on a particular day.  A number of Distributors

3    testified that they do not keep records as to when helpers serviced their routes.

4         Branch Sales Managers oversee the territories of each Distributor within their branch.

5    According to Plaintiffs, Flowers, through these Branch Sales Managers, sets Distributors' routes

6    and makes suggestions—which they must heed—as to the product types and quantities to stock in

7    each store.  In contrast, Defendants' declarants urge that such is not the case and that, to the

8    contrary, Distributors maintain complete decision-making power on the order of their routes and

9    the types and quantities of products they choose to stock at each store.

10        As to scheduling, as discussed above the Distributor Agreement requires Distributors to

11   comply with all customer requirements, which are wide-ranging.  Most Flowers customers require

12   distributors to deliver to their stores early in the day.  Some require multiple visits per day.

13   Distributers tended to work five days a week.  On at least one occasion, Flowers instructed

14   Distributors to work on a holiday.  (Dkt. No. 61-3 at 150-153.)

15        When it comes to control and oversight, Flowers management provides "Branch Route

16   Scorecards" to the Distributors and ranks their stores by the number of stale products on each

17   route.  In accordance with the Distributor Agreement, Flowers management has issued breach

18   letters to Distributors notifying them that their service had fallen below "Good Industry Practice"

19   or the customer's standards or has placed Distributors on a "performance plan" or a "stale cap"—a

20   maximum amount of stale product that Flowers would buy back.  (*See, e.g.*, Dkt. No. 61-4 at 50;

21   Dkt. No. 61-6 ¶ 16.)  The amount and type of oversight that Distributors report receiving varies

22   significantly, with some—like Plaintiffs—averring that there was significant oversight, control,

23   and feedback from Flowers management, and they had no choice but to accept Flowers'

24   suggestions for product type and product placement, while others—namely, Defendants'

25   declarants—stating that they had complete control over their routes and could always reject

26   Flowers' suggestions for how to run their businesses.

27   **II.      Procedural History**

28        Plaintiffs' wage-and-hour claims all arise under the California Labor Code and include

failure to reimburse Plaintiffs for business expenses; making improper deductions from Plaintiffs'

compensation because of the return of out-of-date product, work-related expenses, and losses not

attributable to Plaintiffs; failing and refusing to provide Plaintiffs with meal periods or paid rest

periods; unlawfully deducting money from Plaintiffs' wages; failing to provide accurate itemized

wage statements; intentionally, recklessly, and/or negligently misrepresenting to Plaintiffs the true

nature of their employment status, and willfully and unlawfully misclassifying Plaintiffs as

independent contractors.  Based on these same underlying violations, Plaintiffs also bring a claim

under the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200.  (*Id.*)  All of these claims

arise from Plaintiffs' allegation that Defendants misclassified them as independent

contractors/franchisees instead of employees.

Plaintiffs seek to represent the following class under Federal Rule of Civil Procedure

23(b)(3):

> All persons who have personally serviced a territory in Northern California (i.e., areas from Visalia north to the Oregon border and from the Pacific Coast to the Nevada border) under a Flowers Baking Company of California and/or Flowers Baking Company of Modesto 'Distributor Agreement' that they entered into on behalf of themselves or entities in which they have a majority ownership interest (referred to as 'Distributors') during the period commencing February 25, 2013 through the date of class certification.

(*See* Dkt. No. 61 at 6.)  In addition, Plaintiffs seek to have certified for classwide resolution each

of the substantive wage-and-hour causes of action in the complaint.  (*Id.*)

Though this is the first misclassification action involving Flowers Modesto, it is not the

first misclassification lawsuit that distributors have filed against Flowers the parent company or

Flowers California, and there are other misclassification lawsuits involving other subsidiaries.

Most of these other actions involve individual plaintiffs.[4]  But there are two other instances that

predate this case where distributors have filed suit against Flowers seeking to litigate the

misclassification on behalf of a class of distributors.  In *Rehberg v. Flowers Baking Company of*

---

[4] These individual actions include *Porreca v. Flowers Baking Co. of Cal., LLC*, No. 1:15-cv-00732-DAD-MJS (E.D. Cal.); *Brownfield v. Flowers Baking Co. of Cal., LLC*, No. 2:15-cv-02034-JAM-ACT (E.D. Cal.); and *Johnson v. Flowers Baking Co. of Cal., LLC*, No. 2:16-cv-00840-JAM, AC (E.D. Cal.).

*Jamestown, LLC*, No. 3:12-cv-00596-MOC-DSC, 2015 WL 1346125 (W.D.N.C. Mar. 24, 2015), three named plaintiffs sued Flowers alleging that Flowers had misclassified them as independent contractors and, as a result, denied them certain benefits owed under North Carolina's labor laws and the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201.  *Id.* at *1.  The court there certified a class of "[a]ll person who . . . worked as Distributors in the State of North Carolina for Flowers Foods, Inc. or Flowers Baking Co. of Jamestown, LLC and who were classified as independent contractors" during the class period for misclassification claims under both the FLSA and state law.  *Id.* at *3, 14.

In contrast, in *Martinez v. Flowers Foods, Inc.*, No. CV 15-5112 RGK (Ex) (C.D. Cal.), the court denied the plaintiffs' motion to certify a class of "[a]ll persons who have personally serviced a territory in Southern California . . . under a Flowers . . . 'Distributor Agreement' that they entered into on behalf of themselves or entities in which they have a majority ownership interest" during the class period.  *Martinez v. Flowers Foods, Inc.*, No. CV 15-5112 RGK (Ex), Dkt. No. 52 (C.D. Cal. Feb. 1, 2016).  The court concluded that the plaintiffs had met all four listed Rule 23(a) factors, but the centerpiece of the court's analysis was the absence of ascertainability: because neither party maintained records showing which distributors "personally serviced" their routes, as opposed to those who hired helpers to do so, there was no reliable way to determine who was in the class.  *Id.* at 6-7.  The court also concluded that individual issues predominate because, although the putative class members' responsibilities all stemmed from the same distributor agreement, the agreement's language was so broad that it did not reflect a uniform policy, and variations among individual distributors' experience rendered the question of the employers' control not amenable to class-wide proof.  *Id.* at 11-13.  The named plaintiffs later stipulated to dismiss the case.  *Martinez v. Flowers Foods, Inc.*, No. CV 15-5112 RGK (Ex), Dkt. No. 69 (July 6, 2016).  Thereafter, two other distributors moved to intervene, and the court denied their motion.  *Martinez v. Flowers Foods, Inc.*, No. CV 15-5112 RGK (Ex), Dkt. No. 79 (Sept. 8, 2016).  The case is now pending before the Ninth Circuit, as the proposed intervenors have appealed the orders denying class certification and denying intervention.  (*See* Dkt. No. 80.)

**LEGAL STANDARD**

To succeed on his motion for class certification, Plaintiff must satisfy the threshold requirements of Federal Rule of Civil Procedure 23(a) as well as the requirements for certification under one of the subsections of Rule 23(b).  *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012).  Rule 23(a) provides that a case is appropriate for certification as a class action if

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  "[A] party must not only be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, typicality of claims or defenses, and adequacy of representation, as required by Rule 23(a)," but "also satisfy through evidentiary proof at least one of the provisions of Rule 23(b)."  *Comcast v. Behrend*, ——U.S. ——, 133 S. Ct. 1426, 1432 (2013) (internal quotation marks, citations, and emphasis omitted).

In this case, Plaintiffs contends that the putative class satisfies Rule 23(b)(3), which requires the Court to find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

## DISCUSSION

### I.      Plaintiffs Have Satisfied Rule 23(a)

The Court may certify a class only where "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."  Fed.

R. Civ. P. 23(A).

> A.   <u>Numerosity</u>

A putative class satisfies the numerosity requirement "if the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).  Impracticability is not impossibility, and instead refers only to the "difficulty or inconvenience of joining all members of the class." *Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909, 913-14 (9th Cir. 1964) (citation omitted).  "While there is no fixed number that satisfies the numerosity requirement, as a general matter, as class greater than forty often satisfies the requirement, while one less than twenty-one does not." *Ries v. Ariz. Beverages USA LLC*, 287 F.R.D. 523, 526 (N.D. Cal. 2012).

Plaintiffs estimate that the class contains approximately 150 distributors, making it impractical to bring all class members before the court on an individual basis.  Defendants do not dispute this contention.  Accordingly, Plaintiffs have established that the class is sufficiently numerous.

> B.   <u>Typicality</u>

Rule 23(a)(3) also requires that "the [legal] claims or defenses of the representative parties [be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).  "Typicality refers to the nature of the claim or defense of the class representative and not on facts surrounding the claim or defense." *Hunt v. Check Recovery Sys., Inc.*, 241 F.R.D. 505, 510 (N.D. Cal. 2007) (citing *Hanon v. Dataprods. Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)).  "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Evon*, 688 F.3d at 1030 (internal quotation marks and citation omitted).  The typicality requirement ensures that "the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 158 n.13 (1982).

Here, Plaintiffs' claims are typical of the class because they arise out of Flowers' policy of misclassifying Distributors under the same Distributor Agreement and, consequently, resulted in a similar or common injury.  For example, in *Rehberg* the court concluded that the plaintiffs,

United States District Court
Northern District of California

11

United States District Court
Northern District of California

Flowers distributors in North Carolina, were typical of the putative class because they alleged that Flowers violated that state's wage-and-hour laws "through the same standardized policy of classifying them as independent contractors, failing to pay wages and overtime pay, and making unauthorized compensation deductions.  The facts proving Plaintiffs' claim derive from the Defendants' uniform application of the 'misclassification' and 'wage deduction' policies to all distributors.  All proposed class members were subject to these policies, and all signed agreements classifying them as independent contractors." *Rehberg*, 2015 WL 1346125, at \*9-10.  Courts in this District have similarly concluded that where a misclassification stems from a single corporate policy, the named plaintiffs' claims are typical.  *See, e.g.*, *Smith v. Cardinal Logistics Mgmt. Corp.*, No. 07-2104 SC, 2008 WL 4156364, at \*5 (N.D. Cal. Sept. 5, 2008) (finding typicality where the plaintiffs "presented evidence that Cardinal had a corporate practice of classifying delivery drivers as independent contractors and that this practice was common to the overwhelming majority of Cardinal delivery drivers").  So too here.

Defendants' arguments to the contrary are unpersuasive.  Defendants contend that the named Plaintiffs' claims are not typical because they have not shown that other drivers were treated the same way they were, and Soares testified that Defendants treated him differently from other distributors.  (Dkt. No. 62 at 32.)  But typicality refers to the nature of the claim, not the specific facts of each violation.  *See Hanon*, 976 F.2d at 508.  And in any event, even accepting this argument as true for the purposes of analysis, there is no evidence that Plaintiff Botelho was treated differently from other class members, so at least one named Plaintiffs' claims are typical of the putative class.  Plaintiffs have satisfied this prerequisite.

C.   Adequacy of Representation

Rule 23(a)(4) imposes a requirement related to typicality: that the class representative will "fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  The Court must ask: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the actions vigorously on behalf of the class?"  *Evon*, 688 F.3d at 1031 (quoting *Hanlon*, 150 F.3d at 1020); *see also Brown v. Ticor Title Ins.*, 982 F.2d 386, 290 (9th Cir. 1992) (noting that adequacy of representation

1    "depends on the qualifications of counsel for the representatives, an absence of antagonism, a

2    sharing of interests between representatives and absentees, and the unlikelihood that the suit is

3    collusive") (citations omitted); Fed. R. Civ. P. 23(g)(1)(B) (stating that "class counsel must fairly

4    and adequately represent the interests of the class").

5         Plaintiffs are adequate representatives because they "seek relief for common injuries that

6    would benefit the entire class" and they and counsel have actively and sufficiently served the

7    class. (*Id.* at 19-20.)  The named Plaintiffs have also submitted declarations averring that they

8    have actively served the class by responding to discovery and sitting for their depositions.  (Dkt.

9    No. 61-6 at 492 ¶¶ 2-5; *id.* at 523 ¶¶ 2-5.)  Their participation in this lawsuit has been adequate.

10        Defendants argue that Plaintiffs are not adequate  because they seek relief that other

11   putative class members do not want—that is, because other distributors do not want to be

12   classified as employees and prefer to remain independent contractors.  (*See* Dkt. No. 62 at 31-32

13   (citing *Alberghetti v. Corbin Corp.*, 263 F.R.D. 571, 578 (C.D. Cal. 2010).)  In Defendants' view,

14   this creates conflicts between the named Plaintiffs and other putative class members.  In support of

15   this argument Defendants cite the declarations of three current Flowers distributors who state that

16   they became distributors intending to be independent contractors, enjoy being independent

17   contractors and the freedom and flexibility the arrangement.  (Dkt. No. 63-1 ¶¶ 2, 6, 8; Dkt. No.

18   63-3 ¶¶ 2, 9, 43); Dkt. No. 63-4 ¶¶ 2, 8.)  Two of the distributors state that they heard about this

19   lawsuit and think it is "ridiculous."  (Dkt. No. 63-1 ¶ 42; Dkt. No. 63-3 ¶ 45.)  A third states that

20   the lawsuit "worries" him because he wants to "continue to be an independent business person[.]"

21   (Dkt. No. 63-4 ¶ 54.)

22        This argument is unpersuasive.  First, Plaintiffs' lawsuit would not foreclose these three

23   distributors' desire to remain independent contractors.  Even if Plaintiffs were to prevail on their

24   misclassification claim, that only pertains to the current arrangement.  Defendants would still be

25   free to hire independent contractors to perform distribution work provided that the arrangement

26   complies with California law.  *See Smith*, 2008 WL 4156364, at *7.

27        Moreover, Defendants' argument is premised on the opinions of two percent of the entire

28   potential class, which is "a statistically insignificant sample of the views of their fellow

United States District Court
Northern District of California

13

United States District Court
Northern District of California

[distributors] and class members, [and] there is nothing to suggest (and [Defendants] do not contend) that these [three] drivers were randomly selected and constitute a representative sample of the driver population." *O'Connor v. Uber Techs., Inc.*, No. C-13-3826, 2015 WL 5138097 at *12 (N.D. Cal. Sept. 1, 2015) (footnote omitted). As in *Uber*, "[n]or is there evidence that the responses of these [distributors] were free from the taint of biased questions. Nothing suggests, for instance, that they were told that were the Plaintiffs to prevail, they might be entitled to thousands of dollars." *Id.* (footnote omitted). Indeed, this is just the conclusion that the *Martinez* court reached —the opinion on which Defendants so heavily rely elsewhere. *See Martinez v. Flower Foods, Inc.*, No. CV 15-5112 RGK (Ex), at 9-14 (C.D. Cal. Feb. 1, 2016). And in the case Defendants cite, the putative class members had taken a union vote in which a "large majority" of the putative class rejected a union proposal for the same relief the plaintiffs sought. *Alberghetti*, 263 F.R.D. at 578. Not so here. Ultimately, "[t]he fact that . . . some potential class members may prefer their current employment situation[ ] is not sufficient to defeat adequacy." *Guifu Li v. A Perfect Franchise, Inc.*, No. 5:10-CV-01189, 2011 WL 4635198, at *9 (N.D. Cal. Oct. 5, 2011). Plaintiffs have established that they are adequate class representatives.

Rule 23(a)(4) also requires the Court to inquire into the capability of Plaintiffs' counsel in prosecuting the claims on behalf of the class. *Dukes*, 509 F.3d at 1185. "In the absence of a basis for questioning counsel's competence, the named plaintiffs' choice of counsel will not be disturbed." *Breeden*, 229 F. R.D. at 630 (citation omitted). Plaintiffs' counsel have submitted evidence indicating that they are fully capable of adequately representing the class. (*See* Dkt. No. 61-1 ¶¶ 4-5.) The Court therefore finds that the named Plaintiffs' claims are typical of the class and that they and their counsel will adequately represent the interests of the class.

D.   Commonality

"[C]ommonality requires that the class members' claims 'depend on a common contention such that 'determination of its truth or falsity will resolve an issue that is central to the validity of each [claim] in one stroke.'" *Mazza*, 666 F.3d at 588-89 (quoting *Wal-Mart Stores v. Dukes*, 131 S. Ct. 2541, 2551 (2011)). "The plaintiff must demonstrate the capacity of classwide proceedings to generate common answers to common questions of law or fact that are apt to drive the

14

United States District Court
Northern District of California

resolution of the litigation." *Id.* (internal quotation marks and citation omitted).  A question is common to the class where "determination of its truth or falsity will resolve an issue that is central to the validity of each of the claims in one stroke."  *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1068 (9th Cir. 2014).  The commonality requirement is construed permissively and is "less rigorous than the companion requirements of Rule 23(b)(3)."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998).  To that end, the commonality requirement can be satisfied "by even a single question."  *Trahan v. U.S. Bank Nat'l Ass'n*, No. C 09-03111 JSW, 2015 WL 74139, at *5 (N.D. Cal. Jan. 6, 2015).  Ultimately, commonality "requires the plaintiff to demonstrate the class members have suffered the same injury."  *Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1029 (9th Cir. 2012) (quoting *Dukes*, 131 S. Ct. at 2551).

Here, Plaintiffs satisfy the commonality requirement because whether Defendants misclassified its distributors as independent contractors under California law is a common question that is capable of common resolution for the class based on the Distributor Agreements that all putative class members signed.  *See, e.g.*, *Bowerman v. Field Asset Servs., Inc.*, No. 13-cv-00057-WHO, 2015 WL 1321883, at *14 (N.D. Cal. Mar. 24, 2015) ("*Bowerman I*") ("[W]hether putative class members were misclassified under California law as independent contractors instead of employees . . . is a common question that is capable of a common resolution for the class.") (citations omitted); *Villalpando v. Exel Direct Inc.*, 303 F.R.D. 588, 606 (N.D. Cal. 2014) (holding that the "threshold issue" of whether plaintiffs were employees or independent contractors was sufficient to establish commonality); *Norris-Wilson*, 270 F.R.D. at 604 (finding a common question where "all members of the putative class were hired by [defendant] and classified as independent contractors pursuant to the same [agreement]" and "the merits of that classification turn on the same set of circumstances"); *Smith*, 2008 WL 4156364, at *5 (finding a common question "whether [ ] putative class members were improperly classified as independent contractors in violation of California law").

Defendants concede that the common misclassification policy exists, but nevertheless argue that there are no common questions whatsoever because the relevant inquiry on a misclassification claim is the alleged employer's right to control the manner and means of the

United States District Court
Northern District of California

1   work, and to answer this question the Court must look beyond the Distributor Agreement because

2   the Agreement, by its very language, disclaims the right to control "the specific details or manner

3   of [Distributors'] business . . . ." (Dkt. No. 62 at 18 (citing Dkt. No. 61-6 § 16.1).)  But

4   differences in the way Distributors performed their jobs does not mean that Flowers retained

5   different levels of control over each Distributor.  To the contrary, the relationships all stemmed

6   from the same Distributor Agreement.  To the extent that its language was vague, it was vague for

7   all Distributors.  Moreover, Plaintiffs' contention is that other provisions of the Distributor

8   Agreement—including the requirement that Distributors follow "Good Industry Practice"—give

9   rise to the level of control indicative of an employment relationship.

10         On that note, Defendants also urge the Court to follow the district court's decision in

11   *Martinez* by assessing how the parties interpret and implement the broad "Good Industry Practice"

12   language to determine if, in practice, Flowers exercises control over the "specific details or

13   manner" of Distributors' business contrary to the written agreement.  (Dkt. No. 62 at 18 (citation

14   omitted).)  *Martinez* is not binding authority on this Court, and it conflicts with a number of

15   decisions from this District that emphasize that the relevant inquiry is the level of control the

16   alleged employer retained, not actually exercised.  *See, e.g.*, *Bowerman v. Field Asset Servs., Inc.*,

17   --- F. Supp. 3d ----, No. 3:13-cv-00057-WHO, 2017 WL 1036645, at *10-11 (N.D. Cal. Mar. 17,

18   2017) (citation omitted); *Narayan v. EGL, Inc.*, 285 F.R.D. 473, 476-78 (N.D. Cal. 2012)

19   ("*Narayan II*").  But even if the Court were to follow *Martinez* as Defendants urge, the court there

20   easily concluded that there were common questions arising from the alleged misclassification

21   because the plaintiffs "presented evidence showing that [the] putative class members' claims stem

22   from a common source in that they all worked for Defendants and they were all subject to the

23   same company policies during the relevant class period."  *See Martinez v. Flowers Foods, Inc.*,

24   No. CV 15-5112 RGK (Ex), Dkt. No. 52, at 9 (C.D. Cal. Feb. 1, 2016).  So too here.  Defendants'

25   remaining arguments are more relevant to the more searching predominance inquiry under Rule

26   23(b).  *See Guifu Li*, 2011 WL 4635198, at *13 n.4 ("The fact that the plaintiffs may meet the

27   commonality requirement when the employer has a blanket policy of classifying class members as

28   independent contractors does not establish that common questions of fact or law predominate.")

1   (citation omitted).

2         There are also common questions as to Plaintiffs' substantive claims, as well, as they all

3   stem from common practices. That is, assuming Distributors are, in fact, employees and not

4   independent contractors, Plaintiffs have offered sufficient proof that Flowers had common policies

5   of deducting Distributors' compensation to account for stale product and forcing Distributors to

6   bear work-related costs and expenses and had no policies to ensure Distributors were provided

7   meal breaks and rest periods. The Rule 23(a) requirements are satisfied.

8   **II.**       **Plaintiffs Have not Satisfied Rule 23(b)**

9         A.    <u>Common Questions do not Predominate</u>

10         To meet the predominance requirement of Rule 23(b)(3), "the common questions must be

11   a significant aspect of the case that can be resolved for all members of the class in a single

12   adjudication." *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1068 (9th Cir. 2014) (internal

13   quotation marks and alterations omitted). The predominance inquiry "presumes that there is

14   commonality and entails a more rigorous analysis[.]" *Hanlon*, 150 F.3d at 1022. While Rule

15   23(a)(2) asks only whether there is a common issue, the predominance inquiry considers the

16   common questions, "focuses on the relationship between the common and individual issues," *id.*,

17   and requires the court to weigh the common issues against the individual issues. *See Dukes*, 131

18   S. Ct. at 2556.

19         "Considering whether 'questions of law or fact common to the class predominate' begins,

20   of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v.*

21   *Halliburton Co.*, 131 S. Ct. 2179, 2184 (2011). "[T]he Court identifies the substantive issues

22   related to plaintiff's claims . . . then considers the proof necessary to establish each element of the

23   claim or defense; and considers how these issues would be tried." *Gaudin v. Saxon Mortg. Servs.,*

24   *Inc.*, 297 F.R.D. 417, 426 (N.D. Cal. 2013) (citation omitted).

25         1.    *Employee-Independent Contractor Misclassification Claim*

26         a.    Legal Framework

27         Once an individual comes forward with evidence that he provided services for an

28   employer, he has established a prima facie case that the relationship was one of

United States District Court
Northern District of California

employer/employee, and the burden shifts to the putative employer to prove that the presumed employee was an independent contractor.  *Narayan v. EGL, Inc.*, 616 F.3d 895, 900 (9th Cir. 2010) ("*Narayan I*") (citation omitted). [5]  "Because the California Labor Code does not define "employee," courts generally apply the common law test to distinguish between employees and independent contractors." *Bowerman v. Field Asset Servs., Inc.*, --- F. Supp. 3d ----, No. 3:13-cv-00057-WHO, 2017 WL 1036645, at *10-11 (N.D. Cal. Mar. 17, 2017) ("*Bowerman II*") (citation omitted); *Narayan II*, 285 F.R.D. at 476-78.

Under this approach, "[t]he principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired." *S.G. Borello & Sons, Inc. v. Dep't of Indus. Relations*, 48 Cal.3d 341, 350 (1989); *see also Futrell v. Payday Cal., Inc.*, 190 Cal. App. 4th 1419, 1434 (2010) (noting that the key factor is "control of details").  What matters is whether the hirer "retains all necessary control" over the operations, and the strongest factor is whether the hirer can discharge the worker without cause.  *Ayala v. Antelope Valley Newspapers, Inc.*, 59 Cal. 4th 522, 532 (2014); *see also Alexander v. FedEx Ground Package Sys., Inc.*, 765 F.3d 981, 988 (9th Cir. 2014) ("The principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired.") (citation omitted).

The defendant need not maintain a right to control every possible aspect of the plaintiff's work for this factor to indicate the existence of an employer-employee relationship; instead, the relevant question is whether the defendant maintains "all necessary control" over the plaintiff's

---

[5] In actions to recover unpaid minimum wages pursuant to Cal. Labor Code § 1194, "the standards to determine whether Defendants are directly liable are set out in *Martinez v. Combs*, 49 Cal. 4th 35 (2010), where the California Supreme Court held that the definition of 'employer' for minimum wage purposes is provided in the orders of California's Industrial Welfare Commission ("IWC")[.]" *Ochoa v. McDonald's Corp.*, 133 F. Supp. 3d 1228, 1232 (N.D. Cal. 2015) (footnote omitted); *accord Salazar v. McDonald's Corp.*, No. 14-cv-02096-RS, 2016 WL 4394165, at *5 (N.D. Cal. Aug. 16, 2016).  The IWC Wage Order provides three alternative definitions for the term "to employ." *Martinez*, 49 Cal. 4th at 64.  It means: "(a) to exercise control over the wages, hours or working conditions, *or* (b) to suffer or permit to work, *or* (c) to engage, thereby creating a common-law employment relationship." *Id.* at 64 (citation omitted).  The three-prong *Martinez* test has not been extended past the unpaid minimum wages context.  Thus, here, the parties only address the common-law employment relationship, as does the Court.

United States District Court
Northern District of California

United States District Court
Northern District of California

performance of his job duties.  *Borello*, 48 Cal.3d at 357.  "[T]he fact that a certain amount of freedom is allowed or is inherent in the nature of the work involved does not change the character of the relationship, particularly where the employer has general supervision or control."  *Air Couriers Int'l v. Emp'mt Dev. Dep't*, 150 Cal. App. 4th 923, 934 (2007) (internal quotation marks omitted); *Ayala*, 59 Cal.4th at 533 ("Whether a right of control exists may be measured by asking whether or not, if instructions were given, they would have to be obeyed on pain of at will discharge for disobedience.") (internal quotation marks, modifications, and citation omitted).

California courts also consider "several 'secondary' indicia of the nature of a service relationship" for the purposes of a common law employment relationship.  *Borello*, 48 Cal. 3d at 350.  These factors include the right to terminate at will, along with:

> (a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee.

*Borello*, 48 Cal. 3d at 350.  The factors "cannot be applied mechanically as separate tests; they are intertwined and their weight depends often on particular combinations."  *Id.* (citation omitted).

"For purposes of class certification, the issue is whether these factors may be applied on a classwide basis, generating a classwide answer on the issue of employee status, or whether the determination requires too much individualized analysis."  *Narayan II.*, 285 F.R.D. at 478; *see also Ayala*, 59 Cal. 4th at 533 ("A court evaluating predominance 'must determine whether the elements necessary to establish liability [here, employee status] are susceptible to common proof or, if not, whether there are ways to manage effectively proof of any element that may require individualized evidence.") (citation omitted).  Thus, the question is whether Flowers' right of control—whether great or not—is sufficiently uniform to permit classwide assessment.

           b.      Analysis

                 i.      Right to Control

19

United States District Court
Northern District of California

1    With respect to the right to control, the question is "not how much control a hirer

2    *exercises*, but how much control the hirer retains the *right* to exercise." *Ayala*, 59 Cal. 4th at 533

3    (emphasis in original). As the job description for all Distributors is uniformly set forth in the

4    Franchise Disclosure Document and all Distributors sign the same Distributor Agreement, "the

5    degree of control [the contracts] spell[ ] out is uniform across the class." *Ayala*, 59 Cal. 4th at

6    534; *see also Villalpando*, 303 F.R.D. at 608 ("[U]niform contracts are a significant focus of the

7    'right to control' inquiry."). The Distributor Agreement requires Distributors to rotate products in

8    and out of stores consistent with Flowers' six-day coding system and prohibits Distributors from

9    stocking products more than six days old. Thus, Flowers' control over the method of stocking its

10    product is subject to common proof. The Distributor Agreement requires Distributors to conform

11    to Flowers' marketing efforts, which is subject to common proof. It further requires Distributors

12    to accept whatever promotional prices Flowers negotiates for chain accounts, which indicates that

13    control over a Distributor's pricing scheme and negotiating is subject to common proof. Flowers

14    does not itself contractually impose specific timing requirements for routes, but requires

15    Distributors to comply with all customer requirements. While Defendants argue that this is not

16    evidence of Defendants' control but rather the customers,' the Distributor Agreement vests in

17    Flowers the authority to terminate Distributors for failing to comply with customer requirements,

18    whatever they may be. This is contractual, and therefore classwide, evidence of control.

19    Importantly, the Agreement vests in Flowers the authority to discipline or terminate the

20    distributorship relationship if it finds the Distributor is in breach of the contract; the availability

21    and scope of discipline and termination is thus subject to common proof. The Agreement also has

22    provisions monitoring the Distributors' appearance; though the requirements may be minimal, the

23    point is that they are the same for all Distributors.

24    In addition, the Distributor Agreement requires Distributors to perform their services

25    according to "Good Industry Practice," and Distributors can be disciplined via breach letter or

26    terminated for failing to comply with that standard. (*See, e.g.*, Dkt. No. 61-4 at 39.) The parties

27    agree that "Good Industry Practice" is a broad term. Of the two courts to hear motions to certify

28    classes of Flowers Distributors, one concluded that the "Good Industry Practice" standard was

20

uniform evidence of a right to control while the other concluded that it was too broad to be useful. *Compare Rehberg*, 2015 WL 1326125, at *7, *with Martinez*, No. CV 15-5112 RGK (Ex), Dkt. No. 52 at 11 (C.D. Cal. Feb. 1, 2016).  The Ninth Circuit has cited similarly broad provisions as common proof indicative of the right to control.  *See, e.g.*, *Alexander*, 765 F.3d at 990 (agreement that required drivers to comply with "standards of service" including requirements to "[f]oster the professional image and good reputation" of the company and conduct business activities with "proper decorum" supported common proof of a right to control).  Here, given that Flowers retained the right to issue a breach letter when Distributors failed to comply with this standard, there is common evidence of the level of Flowers' control over the class.

Plaintiffs also argue that Flowers' uniform training program—the Distributor College—is further evidence of its right to control the manner and means of Distributors' work that is likewise subject to classwide proof.  But that is the case only with respect to Distributors who participated in the Prospective Distributor program.  Plaintiffs have not identified how many of the putative class members were participants in this program, so it is not clear that even a majority of Distributors attended this training such that evidence of training could be addressed on a classwide basis.  However, the uniform contractual power the Distributor Agreement vests in Flowers to hold Distributors to task for complying with its product coding system and all customer requirements on penalty of discipline or termination, provisions indicating uniform and appearance requirements—however broad—and the absence of contractual provisions indicating that Flowers can dictate Distributors schedules or route details, is enough to indicate that Flowers' right to control is amenable to classwide proof.

Defendants devote the lion's share of their opposition—and indeed, 25 additional pages— to identifying discrepancies among Distributors' experiences when it comes to scheduling, interactions with Branch Service Managers, and product decisions.  But the distinctions among Distributors that Defendants identified do not arise from the Distributor Agreements between those Distributors and Flowers.  These Agreements are all uniform on all matters material to the right to control and all other relevant issues.  Instead, Defendants present evidence that the actual degree of control Flowers *exercised* over Distributors varied.  *See Bowerman II*, 2017 WL

1036645, at *14 (denying defendants' motion to decertify class, noting that defendants new evidence merely showed that they did not always *exercise* control over the plaintiffs' work, but they retained that right by uniform contracts) (citations omitted). These variations may reflect the right to control, but are more relevant to the exercise of control; the former, not the latter, governs the inquiry.

In reaching this conclusion, the Court disagrees with the detailed and thorough opinion in *Martinez*. At oral argument, Defendants urged the Court to show comity for that decision, especially inasmuch as many putative class members in this case were part of that class for a year, the claims arise from the same dispute, and the same California law applies to the misclassification inquiry. Comity is "a discretionary doctrine which permits one district to decline judgment on an issue which is properly before another district." *Church of Scientology v. U.S. Dep't of the Army*, 611 F.2d 738, 749 (9th Cir. 1979). "In its classic formulation, the comity doctrine permits a district court to decline jurisdiction over a matter if a complaint has already been filed in another district[,]" *id.* (discussing what is often called the "first-to-file" rule), but has been expanded to permit a district court to decline to exercise jurisdiction over an earlier-filed case when the later case is further along in the proceedings. *Id.* Thus, comity allows a district court to "transfer, stay, or dismiss" a case "involving the same parties and issues" as another case. *See Cedars-Sinai Med. Ctr. v. Shalala*, 125 F.3d 765, 769 (9th Cir. 1997). Comity is "designed to avoid placing an unnecessary burden on the federal judiciary, and to avoid the embarrassment of conflicting judgments." *Church of Scientology of Cal. v. U.S. Dep't of the Army*, 611 F.2d 738, 750 (9th Cir. 1980).

Here, Defendants do not seek transfer, stay, or dismissal of Plaintiffs' claims; instead, they contend that comity requires this Court to agree with the *Martinez* court's class certification order. There is some support for Defendants' position. In *Baker v. Microsoft Corp.*, 797 F.3d 607 (9th Cir. 2015), the Ninth Circuit reviewed a district court's decision to strike class allegations from a complaint based on another district court's decision denying class certification in a similar, earlier-filed case. *Id.* at 611. The district court there "adopted the suggestion of the American Law Institute (ALI) that a prior denial of class certification on the same subject matter by a different

district court judge be given a rebuttable presumption of correctness." *Id.* (citation omitted).  It determined that the presumption had not been rebutted and struck the class claims. *Id.*  The Ninth Circuit noted that the district court's application of comity "was misplaced" inasmuch as comity might only apply at the class certification stage, not in reviewing the pleadings. *Id.* at 615.  Thus, it suggested—but did not expressly hold—that it is proper for a district court to give a rebuttable presumption of correctness to another district court's certification decision on a class certification motion in a later-filed related case.

Even if the Court were to apply that presumption to the *Martinez* decision, however, the presumption has been rebutted with respect to the right-to-control analysis.  There, the court concluded that common questions did not predominate because the "evidence undermines any argument that [d]efendant uniformly controlled drivers' manner of operating their respective businesses in their territories." *Martinez v. Flowers Foods, Inc.*, No. 2:15-cv-05112-RGK-E, Dkt. No. 52, 13 (C.D. Cal. Feb. 1, 2016).  The court reached that determination by examining in detail the defendants' actual exercise of control over various distributors—recounting evidence of distributors' individual experiences attending training with Flowers, variations in distributors' actual schedules, and differences in the actual level of supervision Flowers managers exercised over them—rather than the *right* Flowers retained to control them, *id.* at 11-13, contrary to California law. *See Ayala*, 59 Cal. 4th at 533 (emphasis in original).  Further, the *Martinez* court based its decision, in part, on its conclusion that the "Good Industry Practice" standard was so broad that the court  had to resort to evidence of actual control. *Id.* at 11.  It may be too broad to reflect retention of control over drivers, but—construing it as such—it is *uniformly* broad as to all drivers.  The Court therefore declines to follow *Martinez*'s conclusion that individual inquiries about Flowers' actual exercise of control predominate over common questions.  Instead, the Court concludes that the right to control is subject to common proof under the Distributor Agreements, which supports predominance.

ii.    Secondary *Borello* Factors

Defendants do not address four of the nine secondary *Borello* factors—namely, whether

United States District Court
Northern District of California

the work is performed under the direction of the principal, the length of service, the method of payment, and whether the work performed is part of Flowers' regular business.  Each of these factors can be resolved through common proof.

The right to terminate at will can also be determined on a classwide basis, as the uniform Distributor Agreement includes termination provisions.  Next, while Flowers insists that the level of skill required to be a Distributor requires individualized proof, given its concession that no special skills are required, this factor is subject to common proof, as well.  Similarly, common proof is available as to who provided the instrumentalities, tools, and place of work for Distributors' work, since they were contractually obligated to use certain Flowers  equipment — like the purchase software on the handheld computers and Flowers' marketing materials—and to obtain other equipment for themselves—like a truck, insurance, and the bakery products they must purchase.

But determining whether the individual performing services is engaged in a distinct occupation or business from the alleged employer will be riddled with individualized inquiries.  *Borello*, 48 Cal. 3d at 350.  A long line of cases has considered "the differences in the class members' operations, such as whether they hired sub-drivers and whether they contracted with other companies."  *Narayan II*, 285 F.R.D. at 479.  In other words, the predominance analysis for this factor turns on whether the distributors or drivers are engaged in different work from each other.  Courts have denied class certification for delivery drivers where it was impossible or difficult to determine whether the putative class members, rather than other individuals who the class members hired, drove the delivery routes on any given day.  For example, in *Spencer v. BeavEx, Inc.*, No. 05-CV-1501 WQH (WMc), 2006 WL 6500597 (S.D. Cal. Dec. 15, 2006), the court denied certification of a class of drivers whom the defendant treated as independent contractors.  The court noted that some *Borello* factors might be capable of classwide resolution, but individual questions of fact and law predominated because of the individualized inquiry required to determine whether drivers were engaged in an occupation or business distinct from that of the defendant.  *Id.* at *16.  Specifically, "[t]he issue of what use different drivers make of the option to use backups and subs is a highly individualized question of fact[.]"  *Id.*

United States District Court
Northern District of California

Similarly, in *Narayan II* the court denied plaintiffs' efforts to certify (1) a class of persons who have operated as pick-up and delivery drivers for the defendant under an independent contractor agreement; and (2) subclasses of drivers who either did or did not hire other individuals as sub-contractors to drive their routes for them. 285 F.R.D. at 475. Citing *Spencer*, the *Narayan II* court noted that "resolving the 'distinct business' factor would require a highly individualized analysis" because of the wide variety of business arrangements among the drivers based on variations in whether they provided delivery services for other companies or hired subdrivers to perform their routes. *Id.* at 478. The *Bowerman* court followed suit in its predominance analysis, noting that this factor "would require individualized inquiries . . . because many vendors operate their own businesses and/or work for entities other than [defendant]." 2015 WL 1321883, at *10 (citing previous order denying class certification). In *Smith*, the court likewise focused its predominance analysis as to this factor on variations in individual driver operations. 2008 WL 4156364, at *3-4, 10. There, the court distinguished *Spencer* and noted that no individualized inquiries into the nature of the drivers' business were required because the class definition was limited to drivers who did not employ other drivers to perform work that the defendants assigned to them. *Id.* at *10 ("Such concerns are inapplicable to the present case, as Plaintiffs' proposed class specifically excludes any [ ] drivers who hired other drivers to drive their routes.")

This case resembles *Spencer*, *Narayan II*, and *Bowerman* more than *Smith*, as the nature of the drivers' businesses—namely, differences in their operations, such as whether they hired subdrivers and whether they contracted with other companies—will require individual inquiries. While the class is limited to Distributors who "personally serviced" their routes, the determination of which Distributors did so, and when, cannot be answered in one fell swoop. Some of the distributors were "absentee" territory owners who never personally serviced their own routes; these Distributors are not part of the class. Others always performed their own routes and did not hire helpers. But others hired helpers or employees who performed the routes some of the time. Neither party has records disclosing which distributors "personally serviced" their routes and which did not, let alone when they did so or for how many days or hours. Further, some Distributors provided delivery services to other companies currently performing Distribution

United States District Court
Northern District of California

services for Flowers.  In contrast, other Distributors drove exclusively for Flowers.  As a result, there would need to be mini-trials into these Distributors' recollections of how often they personally serviced their routes, and when and how often, if at all, they provided distribution services for other companies.  Thus, some Distributors might be found to operate businesses distinct from Flowers' operation while for others this factor would weigh in favor of an employment relationship, and thus this factor is not subject to common proof.

Plaintiffs insist that in *Alexander v. FedEx*, 765 F.3d 981 (2014), the Ninth Circuit clarified that the focus of this *Borello* factor is not whether the putative employees are engaged in a business distinct from the putative employer, but rather whether the employees' work is "wholly integrated" into the putative employer's operations—in other words, in this case the focus is on Defendants' business, not that of the Distributors.  Thus, they argue, *Spencer* and its progeny no longer apply.  But *Alexander* does not support Plaintiffs' position.  To be sure, in discussing this factor the *Alexander* court examined how the drivers' business fit into FedEx's operations, noting that "the work performed by the drivers is wholly integrated into FedEx's operation.  The drivers look like FedEx employees, act like FedEx employees, [and] are paid like FedEx employees." *Id.* at 995 (citation omitted).  But *Alexander* continued on to note that "[w]hile the drivers have opportunities to expand their businesses *by taking on additional routes and hiring helpers*, these opportunities are only available subject to FedEx's business needs." *Id.* (emphasis added).  Thus, the *Alexander* court, like *Spencer* and the other district courts, analyzed whether the employees are engaged in a business distinct from their employer.  In *Alexander*, the factors suggesting that they might did not outweigh the other factors requiring summary judgment for the employees because FedEx controlled the employees' opportunities to do so.  Thus, *Alexander* does not foreclose consideration of variation among the drivers'—or here, Distributors'—business practices.[6]  And

---

[6] Plaintiffs also contend that *Villalpando* provides further support for their interpretation of *Alexander*.  Not so.  In *Villalpando*, the court stated without analysis that the "distinct occupation of business" *Borello* factor is appropriate for treatment on a classwide basis "[t]o the extent the drivers are performing the same type of work[.]" 303 F.R.D. 588, 609 (N.D. Cal. 2014).  The *Villalpando* court did not specify whether it meant the drivers were performing the same type of work for the defendant or, more generally, performing the same type of work as each other.  Thus, the case does not support either interpretation.

1     those variations here will result in individual inquiries.

2            Plaintiffs next urge that this analysis is wrong because in *Ruiz* "the Ninth Circuit held it

3     was reversible error for the district court to predicate its determination that defendant did not have

4     the right to control 'almost entirely' on the fact that 'the drivers could hire helpers and secondary

5     drivers.'"  (Dkt. No. 67 at 15 n.12 (citing Ruiz, 754 F.3d at 1102).)  But here, the Court has

6     determined that the right to control factor is a common question in light of the uniform

7     Distributors' Agreements.  And on this class certification motion, the Court is not deciding the

8     merits of how this factor weighs in the independent contractor/employee analysis. *See Abdullah* v.

9     *U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 964 (9th Cir. 2013) ("Rule 23(b)(3) requires [only] a

10    showing that questions common to the class predominate, not that those questions will be

11    answered, on the merits, in favor of the class." ).  The issue of helpers—and also whether

12    Distributors delivered products for other companies—is not part of the right to control factor at all;

13    rather, it is relevant to whether the Distributors were engaged in a distinct occupation or business.

14    Lastly, Plaintiffs contend that the relevant inquiry is whether the drivers' opportunities to expand

15    business, take on additional routes, and hire helpers were only available subject to Flowers'

16    business needs. (Dkt. No. 67 at 15 (citing *Alexander*, 765 F.3d at 995).) Such inquiry is relevant to

17    the right to control factor, and is capable of classwide resolution as the Court already concluded.

18    But the evidence here supports a finding that the drivers' opportunities in this respect were not

19    subject to Flowers' control and that instead Distributors can hire helpers to service their routes at

20    their discretion.  This evidence, in turn, is relevant to whether certain Distributors are engaged in a

21    distinct business which will require individual inquiries.

22            B.     A Class Action is Not Superior

23            Normally, when a plaintiff fails to meet the predominance requirement, the court need not

24    address the superiority requirement.  *See In re High-Tech Emps. Antitrust Litig.*, 289 F.R.D. 555,

25    563-64 (N.D. Cal. 2014); *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 268 F.R.D. 604,

26    613 (N.D. Cal. 2010).  Put simply, "[i]f each class member has to litigate numerous and

27    substantial separate issues to establish his or her right to recover individually, a class action is not

28    'superior.'"  *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1192 (9th Cir. 2001).  So it is

United States District Court
Northern District of California

here: class action treatment is not superior to case-by-case lawsuits because any classwide trial would be derailed by individualized inquiries into whether, when, and for how many hours each Distributor "personally serviced" her route, making a class action no more efficient or convenient than numerous individual trials. Nevertheless, as the parties have addressed the individual factors, and the Court finds that it is an independent ground for denying class certification, the Court addresses it here.

Factors relevant to the superiority requirement include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;

> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). "A consideration of these factors require the court to focus on the efficiency and economy elements of the class action so that cases allowed under subdivision (b)(3) are those that can be adjudicated most profitably on a representative basis." *Zinser*, 253 F.3d at 1190 (internal citation omitted).

> 1.   *Class Members' Interests in Individually Controlling Prosecution of Separate Actions*

The first factor largely turns on the amount of damages at stake in any individual lawsuit. *See Smith* 2008 WL 4156364, at *11 (noting that courts "have found that where damages sought by each class member are not large, class members have a reduced interest in individually controlling a separate action."). This is because an individual's interest in controlling prosecution of a lawsuit is likely "no more than theoretic where the individual stake is so small as to make a separate action impracticable." *Amchem Prods., Inc. v.* Windsor, 521 U.S. 591, 616 (1997) (citation omitted). Thus, this factor only weighs against class certification where individual damages "run high" such that individual class members have a strong interest "in making individual decisions on whether and when to settle." *Amchem Prods.*, 521 U.S. at 616-17.

United States District Court
Northern District of California

One Plaintiff  testified that his reimbursement claim alone is worth more than $200,000 (Dkt. No. 63-28 at 47), and Plaintiffs concede the recovery may be "significant[.]"  (Dkt. No. 67 at 18.)  Thus, cost of the litigation does not favor class treatment.  And indeed, the cost of litigation has not stopped 26 other Flowers Distributors from filing separate lawsuits against Flowers.  (*See* Dkt. No. 63-8 ¶¶ 8-11; Dkt. Nos.63-13—63—17.)  Distributors' interest in filing their own lawsuits finds support in the lawsuits that 26 Distributors have already filed against Flowers.

### 2.    *The Extent and Nature of any Litigation Concerning the Controversy Already Begun by or Against Class Members*

The second factor is "the extent and nature of any litigation concerning the controversy already commenced by or against members of the class."  Fed. R. Civ. P. 23(b)(3)(B).

> This factor is intended to serve the purpose of assuring judicial economy and reducing the possibility of multiple lawsuits . . . .  If the court finds that several other actions already are pending and that a clear threat of multiplicity and a risk of inconsistent adjudications actually exist, a class action may not be appropriate since, unless the other suits can be enjoined, a Rule 23 proceeding only might create one more action . . . .  Moreover, the existence of litigation indicates that some of the interested parties have decided that individual actions are an acceptable way to proceed, and even may consider them preferable to a class action.  Rather than allowing the class action to go forward, the court may encourage the class members who have instituted the Rule 23(b)(3) action to intervene in the other proceedings.

*Zinser*, 253 F.3d at 1191 (citation omitted).

Here, 26 Distributors have brought individual claims in three different cases.  That those Distributors were able to consolidate their individual claims together suggests that requiring individual actions in lieu of this class action would not overburden the courts.  Moreover, with respect to those lawsuits, the "clear threat of multiplicity and inconsistent adjudications" that the Ninth Circuit warned against is present.  Plaintiffs' only argument with respect to the individual actions is that the Distributor-plaintiffs in those cases have not taken depositions or engaged in significant motion practice.  (*See* Dkt. No. 67 at 18; Dkt. No. 67-3 ¶¶ 3-6.)  But summer 2018 trial dates have been set and there is no indication that those cases are not moving ahead.  (*See* Dkt. No.

1   67-3 ¶¶ 3-6.)  Plaintiffs have not carried their burden of showing that this factor supports the

2   superiority of a class action.

3              **3.**     *The Desirability of Concentrating the Litigation in a Particular Forum*

4          The desirability of concentrating the litigation in a particular forum factor is neutral in this

5   superiority analysis. This case involves drivers who serviced routes in Northern California, many

6   of whom worked out of Flowers warehouses in San Jose and Salinas, which are in this District.

7   Because much of the evidence will be found here, it would be efficient to try the case here.  On the

8   other hand, Defendants are located in Modesto and many of the drivers' territories are located in

9   the Eastern District of California, so there are grounds for the individual actions to proceed there,

10  as well.

11             **4.**     *The Manageability of a Class Action*

12         Finally, the fourth factor considers the manageability of a class action.  *See* Fed. R. Civ. P.

13  23(b)(3).  "[T]his consideration encompasses the whole range of practical problems that may

14  render the class action format inappropriate for a particular suit." *Eisen v. Carlisle & Jacquelin*,

15  417 U.S. 156, 164 (1974).  It includes issues as "the potential difficulties in notifying class

16  members of the suit, calculation of individual damages, and distribution of damages." *Six (6)*

17  *Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1304 (9th Cir. 1990).  "Manageability

18  concerns must be weighed against the alternatives and will rarely, if ever, be sufficient to prevent

19  certification of a class." *Trosper v. Styker Corp.*, No. 13-cv-00607-LHK, 2014 WL 4145448, at

20  *17 (N.D. Cal. Aug. 21, 2014) (internal quotation marks and modifications omitted)

21         Trying this lawsuit as a class action presents manageability issues given the individual

22  inquiries necessary to establish Defendants' liability for each of the putative class members.  For

23  example, the Court would need to hold mini-trials to determine which drivers "personally

24  serviced" their routes, when, and for how many hours and whether they did deliveries for other

25  companies in order to analyze whether a particular driver was engaged in a business distinct from

26  other class members or even whether the Distributor qualifies as a class member. There would also

27  need to be individualized inquiries into how to treat Distributors who may have owned more than

28

United States District Court
Northern District of California

one territory.  Plaintiffs argue that refusal to certify a class "on the sole ground that it would be unmanageable is disfavored and should be the exception rather than the rule."  (Dkt. No. 67 at 18 (quoting *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1128 (9th Cir. 2017) (citation omitted)).) Agreed. But here manageability is not the only factor that weighs against class treatment.

Because class members' have an interest in individually controlling separate actions, as evidenced by the many individual Distributors who have filed their own actions, and trying these claims as a class action creates manageability issues, classwide resolution is not the superior method of adjudicating these claims.

## CONCLUSION

For the reasons discussed above, individualized issues over how to determine which Distributors personally serviced their routes and whether the Distributors' operated distinct businesses prevents common questions of fact or law from predominating and classwide treatment is not superior to individual actions.  Accordingly, the Court DENIES Plaintiffs' motion for class certification.  The Court will hold a further case management conference on **July 27, 2017 at 1:30 p.m.**

This Order disposes of Docket No. 61.

**IT IS SO ORDERED.**

Dated: June 28, 2017

JACQUELINE SCOTT CORLEY
United States Magistrate Judge

United States District Court
Northern District of California

31